CASE 67.—SUITS BY R. B. BANNON AND ANOTHER AGAINST
        M. J. BANNON AND OTHERS TO SET ASIDE A
        TRANSFER OF CERTAIN CORPORATE STOCK
        AND TO HAVE THE P. BANNON SEWER PIPE
        COMPANY AND THE KENTUCKY VITRIFIED
        BRICK COMPANY DISSOLVED AND FOR THE AP-
        POINTMENT OF A RECEIVER.—June 18, 1909.

## Bannon v. Patrick Bannon Sewer Pipe Co.

Appeal from Jefferson Circuit Court (Common
Pleas Branch, Second Division).

SAMUEL B. KIRBY, Judge.

From the judgment for plaintiffs M. J. Bannon ap-
peals.—Reversed.

1.  Action—Equitable Relief—Causes of Action—Misjoinder.—A
    stockholder's suit to settle the affairs of certain corporations
    and for the appointment of a receiver as incidental relief
    could not be properly joined with a suit to set aside certain
    transfers of the stock of the corporations as against one of the
    defendants individually.

2.  Action—Misjoinder—Severance—Election.—Civ. Code Prac.
    Sec. 85, provides that the court at any time before defense
    shall, on motion of a party, require the adverse party to
    elect which of two or more causes of action, improperly
    joined, he will prosecute, and on his refusal so to elect shall
    strike out of the petition, answer, or reply, any cause of
    action improperly joined with another. Held, that, where
    two causes of action were improperly joined, it was defen-
    dants' duty to move to require plaintiffs to elect, and, on
    plaintiffs' failure to do so, it was the court's duty to elect
    for them and dismiss one of the causes of action.

3.  Action—Misjoinder—Severance—Election—Objection—Waiver.
    —Under Civ. Code Prac. Sec. 85, requiring motion to elect
    between misjoined causes of action before answer, an ob-
    jection to such misjoinder is waived, if not made before
    answer is filed.

Bannon v. Patrick Bannon Sewer Pipe Co.

4.  Estoppel—Equitable Estoppel—Knowledge.—Where complain-
    ants had no knowledge of powers of attorney by which their
    father attempted to transfer corporate stock to complain-
    ants and to defendant, their brother, until after the father's
    death, complainants, by accepting the stock transferred to
    them, were not estopped to object that the powers had been
    obtained by defendant's undue influence over the father, and
    that he was overreached and had insufficient capacity to ex-
    ecute it at the time, under the rule that knowledge of the
    truth of the material facts represented or concealed is indis-
    pensable to the application of equitable estoppel, and that the
    person invoking the doctrine must show that he has been
    influenced by and relied on the representations and conduct
    of the person sought to be estopped.
5.  Estoppel—Equitable Estoppel—Mistake.—No estoppel arises
    where the representation or conduct of the party sought to
    be estopped is due to ignorance founded on an innocent mis-
    take.
6.  Witnesses—Attorney ·and  Client—Privilege—Waiver.—Where
    certain powers of attorney executed by deceased providing for
    the transfer of certain corporate stock to his children and
    others were in fact testamentary instruments, signed and at-
    tested by two witnesses, and were attacked after decedent's
    death, when they were first attempted to be enforced on the
    ground that deceased had not sufficient capacity to validly
    execute them, any of the heirs had power to waive the priv-
    ilege of deceased's attorney, by whom the powers were drawn,
    so as to qualify him to testify concerning deceased's capacity.
7.  Witnesses—Testimony of Parties Interested Against Succes-
    sors in Title of Person Deceased—Subject-Matter.—In a suit
    after the grantor's death to set aside transfers of corporate
    stock under certain powers of attorney, on the ground of
    mental incapacity and  undue  influence, any of the heirs
    should have been permitted to testify to conversations had
    with the grantor and statements made by him to show either
    lack of capacity or undue influence.
8.  Evidence—Similar Facts Showing Mental Condition—Corpo-
    rate Stock—Transfer—Undue Influence—Evidence.—In a suit
    to set aside the transfer of corporate stock under powers of
    attorney on the ground of alleged want of capacity and undue
    influence, evidence of conversations and transactions with de-
    ceased grantor must be confined to those bearing directly on
    such issues, and hence evidence that, many years prior to the
    transactions complained of, one of the beneficiaries under the

power in transacting the grantor's business had been guilty of improper conduct, should have been excluded, though such evidence may not be confined to the immediate dates on which the transactions out of which the litigation arose took place.

9. Corporations—Corporate Stock—Transfer—Capacity of Grantor—Question for Jury.—Whether deceased, at the time he executed certain powers of attorney authorizing the transfer of corporate stock, had sufficient mental capacity to do so, was for the jury.

10. Trial—Question for Court and Jury—Evidence.—Where, in a suit to set aside transfers of corporate stock, there was not a scintilla of evidence of fraud inducing the execution of the powers, the court should not have submitted such question to the jury.

11. Corporations—Transfer of Stock—Powers of Attorney—Capacity of Grantor—"Unsound Mind."—A request to charge that if B, on September 2, 1902, did not have mental capacity sufficient to understand his property rights and the character, object and nature of the transfer of the corporate stock in question and to transfer the same according to a definite purpose and desire of his own, then he was of "unsound mind," but if he had mental capacity sufficient to understand his property rights and character, object and nature of the transfer of the stock by means of the powers executed and to transfer the same according to a definite purpose and desire of his own, he was not of unsound mind, sufficiently presented the question of lack of capacity to the jury.

12. Corporations—Transfer of Stock—Power of Attorney—"Undue Influence."—In a suit to set aside certain transfers of corporate stock under powers of attorney alleged to have been obtained by undue influence over the grantor, the court, in submitting the question of undue influence, should have charged that any influence obtained over the grantor to such an extent as to destroy his free agency and to constrain him to do, against his will, what he would otherwise refuse to do, is "undue influence," and the law condemns as undue such an influence when exercised over a testamentary act, whether obtained directly or indirectly or at one time or another, but any reasonable influence obtained by acts of kindness, or by argument addressed to the understanding, is not in law "undue influence."

13. Equity—Special Issues—Submission to Jury—Verdict.—Under Civil Code Prac. sec. 12, authorizing the submission of special issues of fact in an equity suit to a jury, where several issues

are so submitted, they should be answered separately, and it was therefore improper to direct the jury to return a general verdict.

KOHN, BAIRD, SLOSS & KOHN, CHAS. F. TAYLOR and GUY H. BRIGGS for appellant.

McDERMOTT & RAY, O'CONNER & O'CONNER, J. W. S. CLEMENTS and O'NEAL & O'NEAL for appellees.

DODD & DODD for appellee's administrator.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

For many years prior to his death, Patrick Bannon was engaged in the manufacture of sewer pipe and vitrified brick, in Louisville, Ky. They were manufactured at separate plants, and he was the sole owner of each. He had seven children—four daughters and three sons. His sons worked with and assisted him in the conduct of his business, and his oldest son, M. J. Bannon, took quite an active part in the management of both of these plants. In 1902, realizing that he was growing old, and for the purpose of continuing the business after his death for the benefit of his family, he caused each business to be incorporated; the pipe company under the name of "P. Bannon Sewer Pipe Company," and the brick company under the name of the "Kentucky Vitrified Brick Company." He and his sons were the incorporators and the officers of each company. The amount of the capital stock of the pipe company was fixed at $100,000, divided into 1,000 shares of $100 each, and the capital stock of the brick company was fixed at $75,000, divided into 750 shares of $100 each. Patrick Bannon, at the date of the organization of these corporations, transferred to each all of the as-

sets and properties which had theretofore been used by him in the conduct of that business. The brick company was indebted to the German National Bank in the sum of $40,000, and this liability was assumed by the corporation. When incorporated, he transferred to his sons, M. J. Bannon, 200 shares, R. B. Bannon, 100 shares, and Patrick Bannon, Jr., 50 shares in the pipe company, retaining in his own right 650 shares; and at the same time he transferred of the stock of the brick company, to M. J. Bannon, 150 shares, to R. B. Bannon, 40 shares, and to Patrick Bannon, Jr., 75 shares, reserving to himself 485 shares.

On September 2d following, he executed two powers of attorney, by which he disposed of 500 shares of the sewer pipe company stock, and 410 shares of the brick company stock. Said powers of attorney are as follows:

"For value received, I hereby sell, transfer and assign five hundred (500) shares of the stock within mentioned of the P. Bannon Sewer Pipe Company, to the following parties: M. J. Bannon, 250 shares. Lillie Broderick, 13 shares. John W. Jacquemin, Gdn. of Joseph L. Jacquemin, August B. Jacquemin, and John J. Jacquemin, Jr., 37 shares. Mrs. Gertrude O'Connor, 50 shares. Mrs. Mollie Burrell, 50 shares. Mrs. Lillie Hardesty, 50 shares. Mrs. Susannah Bannon, 50 shares. And I request that a certificate be issued to me for the remaining 150 shares of said stock, and I hereby irrevocably constitute and appoint Henry M. Waltring my attorney to make the necessary transfer on the books of the corporation. Witness my hand and seal this 2d day of September, 1902. P. Bannon, Sr. Witnessed by: Herman F. Waltring. Chas. F. Taylor, Atty."

"For value received, I hereby sell, transfer and assign four hundred and ten (410) shares of the stock within mentioned, in the Kentucky Vitrified Brick Company, to the following named parties: M. J. Bannon, 200 shares. R. B. Bannon, 10 shares. Mrs. Gertrude O'Connor, 40 shares. Mrs. Mollie Burrell, 40 shares. Mrs. Lillie Hardesty, 40 shares. Mrs. Susannah Bannon, 40 shares. Lillie Broderick, 10 shares. John Jacquemin, Gdn. of Joseph L. Jacquemin, August B. Jacquemin, and John W. Jacquemin, Jr., 30 shares. And I request that a certificate be issued to me for the remaining seventy-five (75) of said stock, and I hereby irrevocably constitute and appoint Robert L. Burrell my attorney to make the necessary transfer on the books of the corporation. Witness my hand and seal this 2d day of September, 1902. P. Bannon, Sr. Witnessed by: Herman F. Waltring. Chas. F. Taylor, Attorney."

Thus the stock of each of these corporations was owned by the different members of his household until his death in 1906. He left no will. His wife had died in 1903. There survived him his three sons, three daughters, and Lillie Broderick, Joseph L. Jacquemin, August B. Jacquemin, and John W. Jacquemin, Jr., children of Mrs. Louise Jacquemin, a deceased daughter. Some time after his death trouble arose among the children over the conduct of the business of these respective corporations, which resulted in suits being brought by R. B. Bannon and his brother-in-law, against M. J. Bannon, Patrick Bannon, Jr., and the Jacquemin children to have the respective corporations placed in the hands of a receiver. Thereafter, by an amended pleading, filed in October, they sought to have M. J. Bannon en-

vol. 136—36

joined from voting at the stockholders' meeting the stock in the respective corporations represented by the certificate of date September 2, 1902. On December 6th following, a second amended pleading was offered, in which it was sought to have canceled and set aside and held for naught the certificates of stock which had been issued to M. J. Bannon on September 2, 1902, for 250 shares of stock in the sewer pipe company, and for 200 shares of stock in the brick company. M. J. Bannon resisted the filing of this pleading, and filed general and special demurrers thereto, and also a motion to strike out portions thereof. These demurrers and the motion were in turn overruled, and thereupon plaintiffs moved that certain issues of fact be transferred out of chancery for trial before a jury. These issues were those raised by the amended pleading filed in December, in which it was charged that the certificates of stock which had been issued by Patrick Bannon to M. J. Bannon in September, 1902, were procured through the fraud and undue influence of M. J. Bannon over or upon his father, or else that, at the time they were issued, Patrick Bannon did not have sufficient mental capacity to know and understand the nature of the transaction. Issue was joined upon these questions by the answer filed by defendants, and the chancellor submitted them to the jury for its determination. The jury, having heard the evidence offered upon these respective points, returned a verdict in favor of the plaintiffs. The defendant, M. J. Bannon filed a motion and grounds for a new trial, which were overruled, and a judgment was entered directing him to surrender up to the administrator of Patrick Bannon's estate the 250 shares of stock in the sewer pipe company, and the 200 shares of stock in the brick

company, which his father had transferred and issued to him on September 2, 1902.    From that judgment this appeal is prosecuted.

These two suits, involving the same parties plaintiff and defendant, were, by agreement, heard and considered together; the same evidence being used in each.   Six points are relied upon for a reversal: (1) That inasmuch as, at the same time and under the same powers of attorney by which the defendant M. J. Bannon was invested with the shares of stock in controversy, plaintiffs received certain shares of stock from their father, they are estopped from denying that he did not have sufficient mental capacity to know and understand what he was doing, or that he was overreached or unduly influenced in the making of the partial distribution of his estate represented by said stocks.   That, by accepting the stock which these powers of attorney directed to be issued to them, plaintiffs are estopped from denying that Patrick Bannon at that time did not have capacity to execute the powers, or that he was overreached or deceived into the execution of same.   In other words, that they can not hold under and against these powers of attorney.    (2) That the court erred in refusing to permit Charles F. Taylor, the attorney of Patrick Bannon, who drew the power of attorney, to testify concerning the conversations had with deceased at the time these powers of attorney were executed, and the instructions which he received from deceased relative to their execution, and the circumstances under which they were drawn and prepared. (3) That, inasmuch as there was no proof of mental incapacity at the time of the transfer of this stock, the court erred in submitting this question to the jury. (4) As there was no proof of either fraud or un-

due influence exercised over deceased by appellant, these questions should not have been submitted to the jury. (5) That even though the court should be of opinion that there was evidence of fraud or undue influence, which authorized the submission of this question to the jury, still the instructions as given by the court upon these points were erroneous. And (6) that the verdict of the jury was valueless as an aid or guide to the chancellor, for the reason that it is general in nature; whereas, in order to be of service to the chancellor in reaching a proper conclusion, the finding of the jury upon the facts submitted should have been a special, and not a general, finding.

The suits, as originally brought, were in equity, and the relief sought a purely equitable relief. The cause of action set up in the amended petition filed in December was clearly a misjoinder, for the relief sought in this second amended petition was in no wise connected with the original cause of action, in which the relief sought was the settlement of the affairs of the respective corporations, and, as a means to that end, the appointment of a receiver to take charge of each while they were being wound up; whereas, the relief sought in the amendment filed in December was one purely personal to the defendant M. J. Bannon. Neither corporation had any interest whatever in the result of the litigation between the plaintiffs and the defendant M. J. Bannon over the question of the validity of his title to the shares of stock described in the second amended petition. This was a separate and distinct cause of action, and the court should not have permitted this pleading to be filed, or, having permitted it to be filed, it was the duty of defendants, as provided by section

85 of the Civil Code of Practice to have called the court's attention to the fact that the two causes were not properly joinable, and enter their motion to require plaintiffs to elect which cause they would prosecute, and, upon plaintiffs' failure to elect, the court should have elected for them, and dismissed one or the other of said causes of action; but, inasmuch as the defendants failed to make such motion at the proper time, and filed answer, they waived this objection, and may not now complain because thereof. Wilson v. Thompson, 1 Metc. 123; Sale v. Crutchfield, 8 Bush, 636; Murray v. Booker, 58 S. W. 788.

On the question of estoppel it is but necessary to note that the plaintiffs did not know of the existence of the powers of attorney referred to at the time they received the stocks which their father had directed to be issued to them under said powers. In fact, it appears that they did not know of the existence of such powers of attorney until after the death of their father; nor does it appear that when they received their respective shares of stock, passed to them by these powers of attorney, they knew that their brother M. J. Bannon had at the same time received the 250 and 200 shares of stock respectively, which they directed transferred to him. In order that the doctrine of estoppel might become applicable at all, plaintiffs must have acted with full knowledge of the facts. Unquestionably, if, at the time this distribution was made, P. Bannon, Sr., had called his children before him, and had told them that he was proposing to make a partial distribution of his stock, and that he proposed to give each the portion designated in the powers of attorney, and they had accepted those gifts from him, under such

circumstances a different case would be presented
from that which we have under consideration; but
where they did not know of the execution of the
powers, and were wholly ignorant of their terms,
the acceptance of the stocks by them can not operate
as a bar to prevent them from prosecuting these
suits for the purpose of showing, if they can, that, at
the date of the execution of said powers of attorney,
their father's health and mind were so enfeebled by
the weight of years that he was incapable of under-
standing the nature-or extent of the transaction, or
that in the execution of these powers he was over-
reached and unduly influenced by his son M. J. Ban-
non.

In 16 Cyc. p. 730, the general rule is thus stated:
"Knowledge of the truth as to the material facts
represented or concealed is generally indispensable
to the application of equitable estoppel." And
again: "It is an essential element of equitable estop-
pel that the person invoking it has been influenced by
and relied upon the representations or conduct of
the person sought to be estopped." If we enter-
tained any doubt as to the correctness of the conclu-
sion reached upon this point, it would be entirely re-
moved by the application of the following well-rec-
ognized rule: "No estoppel arises where the repre-
sentation or conduct of the party sought to be estop-
ped is due to ignorance founded upon an innocent
mistake." Appellant was in no wise influenced to
receive his stock by any act on the part of appellees
and he is now in no position to seek to deny to them
the right to inquire into the circumstances under
which these powers of attorney which passed this
stock were executed. Of course, in the equitable settle-
ment and adjustment of matters, if it should develop

that   Patrick Bannon, at the date of the execution of
these powers, did not have sufficient mental capacity
to enable him to know what he was doing, or was un-
duly influenced and overreached by defendant M. J.
Bannon, and  because of such  facts the certificates
issued to him· should be directed to be canceled, all
other certificates which were issued under the same
powers would likewise, on complaint made, be held
of no binding force and effect.

On the  second ground  for reversal relied upon,
more difficulty is presented.   The testimony of the
witness Charles F. Taylor was of vital importance
to the defendant M. J. Bannon in the presentation
of his defense to the charge of undue influence, and
also want of capacity on the part of his father to
know and understand what he was doing at the time
he incorporated these companies and executed the
powers of  attorney in question.   He  was better
qualified to speak concerning these transactions than
any witness who was offered, or could have been of-
fered, to testify in  regard thereto, and  appellant
should not have been denied the right to the benefit
of this testimony unless the rigidity of the rules of
law governing the introduction of evidence positively
prohibited it.   The  trial court seemed to  have pro-
ceeded upon the idea that, as these transactions were
communications between attorney and  client, they
were privileged. They are confidential and privileged,
but this privilege extends only to the client.   He may
waive it if he desires, and, in cases where the ends
of justice require it, some courts have compelled an
attorney to testify, even though his client has not
waived the privilege.   Were Patrick Bannon living,
and these questions made, there can be no doubt but
what he could waive this privilege, and permit his

attorney to take the stand and testify fully as to
the transaction; and, as this is a contest between his
children, we see no reason why they, or any of them,
can not waive the privilege and have the attorney
testify concerning these transactions which are of
such vital importance in the determination of the
questions involved in this litigation.

It is the policy of the law, as far as possible, to
turn the searchlight of investigation upon every
transaction connected with a case, in order that the
truth may be known. This is especially true where
the charges are such as we have under consideration
here. To this end it is in the interest of justice that
every one having any connection with the transaction
should be permitted to tell all he knows about it. The
writings under consideration, which authorized the
transfer of the shares of stock in question, are in
many respects testamentary in character. They
were each signed by Patrick Bannon in the presence
of, and attested by, two witnesses, and were, imme-
diately upon their execution placed in charge of Hen-,
ry M. Waltring, and were, by him, put under lock and
key in a safe of which he alone knew the combina-
tion and to which he alone had access. Thus
they were kept until after the death of Patrick Ban-
non, so far as the record shows. Shortly after the
contents thereof became known, these suits were
filed attacking their validity. In a contest over a
will, the weight of authority is to the effect that
communications made to an attorney by the testator
while giving instructions for drafting the will are
held not to be privileged to the extent that he can not
testify in regard thereto. This is on the ground that
the protection which the rule gives is the protection
of the client, and that it can not be said to be to the

interest of the testator, in a controversy between
other parties, to have those declarations excluded
which are relevant and necessary to the proper exe-
cution of his will, and this is especially true when
those attacking the will seek to take advantage of the
privilege. Jones on Evidence, vol. 3, sec. 773. The
cases before us are very analogous, and the reason
for applying the rule, which is, according to the
authority just quoted, of general applicability in will
contests, to the case at bar, is most potential. Here
we have some of the children of Patrick Bannon, de-
ceased, attacking the validity of these powers of at-
torney which were executed by him, and at the same
time resisting the introduction of the evidence of
that witness, who, of all others, is most capable to
speak in regard thereto. We are of opinion that the
testimony of Charles F. Taylor is not only relevant,
but essential, to a fair and proper determination of
the questions in issue in this case. Since its exclu-
sion could serve no good purpose, and its introduc-
tion might throw much light upon the cases, we think
that the testimony of this witness should have gone
to the jury, and the trial court erred in excluding it.

The court refused to permit certain of the appel-
lees to testify with reference to conversations had
with their father, and statements made by him for
the purpose of showing lack of capacity to transact
business; or that he was overreached or unduly in-
fluenced in business transactions by the appellant.
This was error. This court has repeatedly held, in
contests over the probate of a will, that the heirs at
law are competent witnesses, and may detail any
transaction or conversation with the testator which
would tend to throw light upon the question of ca-
pacity or undue influence exercised over him at the

time of the draft of the will.  So, likewise, in considering the questions involved in this case, the court should have permitted any of the heirs to testify to conversations or transactions which would have thrown any light upon the issues involved; they being exactly similar to those in a will contest where the questions raised were want of capacity and undue influence.  Flood v. Pragoff, 79 Ky. 607; King v. King (Ky.) 42 S. W. 347; Milton v. Hunter, 13 Bush, 163.  There can certainly be no reason for applying a different rule of evidence in the trial of a case where the question is want of capacity in one to make a contract or execute a power of attorney, from that which is applied in a case where the question is want of capacity to execute a will.  Evidence that would be competent in the one case would certainly be competent in the other; and, since heirs at law have repeatedly been held to be competent witnesses for this purpose in will contests, by analogy of reasoning they are competent witnesses in the case at bar.  Of course, the evidence of the heirs at law, as that of other witnesses, must be confined to such conversations and transactions as have some bearing directly upon the questions at issue, and the court should not permit the introduction of any evidence which does not have such bearing.  Hence all of that evidence which was introduced, over the objection of appellant, to the effect that, many years before the date of the transactions complained of, appellant had in the furtherance of his father's business, been guilty of improper conduct, should have been excluded.  It could serve to throw no possible light upon the questions under consideration, but, on the contrary, it tended rather to confuse and cloud the

issues and, upon another trial, none of this evidence should be admitted.

On the questions of undue influence and want of capacity, as in will contests, the evidence must of necessity take a wide range, and can not be confined to the immediate dates upon which the transactions out of which this litigation grows took place. Any evidence tending to establish lack of capacity on the part of Patrick Bannon to execute the powers of attorney in question, or that in the execution thereof he was unduly influenced by his son, M. J. Bannon, is competent. Complaint is made that there is a total failure of evidence showing want of capacity on the part of Patrick Bannon to execute these powers. and likewise a total failure of evidence of any fraud practiced upon, or any undue influence exercised over, him by his son. As to the first and third propositions, we can not agree with counsel. There is some evidence tending to show that, at or about the time of the execution of the powers of attorney, his mentality was failing. He was an old man, and it was a question for the jury to say, under the facts and circumstances produced in evidence, under proper instructions of court, whether or not at the time of the execution of these papers in question, he had sufficient mind to know and understand what he was doing. So, likewise, there is some evidence tending to show that the appellant had and exercised a great influence over his father. Whether this was an undue influence or not should likewise have been submitted to the jury.

On the charge of fraud there is a total failure of evidence. There are not even any facts or circumstances brought out in the evidence which would tend to show that, in the execution of these papers, or in

the incorporation of the companies, the appellant practiced any fraud upon his father, or deceived him, or by means of this character took any advantage of him whatever. Hence, even under the scintilla rule, this question should not have been submitted to the jury, for this court, in the case of Steely v. Commonwealth (decided Sept. 30, 1908) 112 S. W. 655, 129 Ky. 524, expressly held that, where there was no evidence to support a given proposition, it was error to submit that proposition to the jury. In the present case we would not reverse for this error in the instructions alone, but, as the case is to be reversed, the trial court, upon the next trial, if the evidence is practically the same, will give no instruction upon the question of the exercise or practice of fraud by appellant in procuring the papers in question. While holding that there is some evidence tending to show want of capacity and undue influence, we expressly refrain from passing upon or commenting upon the value of such evidence, but simply state that, there being some such, it is a question for the jury under proper instructions.

Appellant complains that the instructions which the court gave did not properly present the law. On the question of lack of capacity, the court gave the following instruction: "(4) If you believe from the evidence that Patrick Bannon, on September 2, 1902, when the stock was transferred, did not have mind and mental capacity sufficient to understand his property rights, and the character, object, and nature of the transfer of the stock, and to transfer the same according to a definite purpose and desire of his own, I instruct you that he was of 'unsound mind,' as this term is used in the first instruction; but if you believe from the evidence that at said time he did

have mind and mental capacity sufficient to understand his property rights, and the character, object, and nature of the transfer of the stock, and to transfer the same according to a definite purpose and desire of his own, I instruct you that he was not of 'unsound mind,' as this term is used in the first instruction." This, we think, is not subject to criticism, but fairly well presents this question to the jury for its consideration.

An instruction defining "undue influence" in practically the same language as that given by the court in this case was, in the recent case of Murphy's Executor v. Hoagland, 107 S. W. 303, condemned for the reason that it was confusing and involved, and, in lieu thereof, the court, in that case, directed the following instruction to be given: "Any influence obtained over the mind of a testator to such an extent as to destroy his free agency, and to constrain him to do against his will what he would otherwise refuse to do, is 'undue influence,' and the law condemns as undue such an influence, when exercised over the testamentary act, whether obtained directly or indirectly, or at one time or another; but any reasonable influence obtained by acts of kindness, or by argument addressed to the understanding, is not, in law, 'undue influence.'" In lieu of the instruction defining "undue influence," the court should give the instruction approved in the Murphy Case modified to suit the case at bar.

As the issue of fraud in procuring the execution of the papers in question is eliminated by reason of lack of evidence, the use of the word "fraud" in the first instruction is, of course, improper, and should, upon the next trial, be eliminated therefrom. Instruction No. 2, defining "fraud," should be omitted

entirely. Instruction No. 3 should be given as above indicated. Instruction No. 4 is approved as given.

The final complaint made by appellant is that the court erred in directing the jury to return a general verdict; whereas, he should have directed them to return specific findings upon the questions submitted. This was an equity action, properly commenced as such, and, under section 12 of the Civil Code of Practice, a litigant has a right to ask to have the issues of fact raised in the pleadings tried by a jury. The verdict of the jury in such case is not conclusive, but merely advisory, and hence it is insisted by appellant that the court erred in directing a general verdict, that, inasmuch as there were two issues of fact submitted to the jury, it was impossible for the court to determine from its verdict whether such verdict was predicated upon a finding that Patrick Bannon was unduly influenced to execute said papers, or did not have sufficient mental capacity. It is urged that a state of facts might have been presented which would have warranted the chancellor in altogether ignoring the verdict of the jury, and entering a judgment to the contrary. For instance, if the jury had found that he did not have sufficient mental capacity to execute the papers, and the chancellor was of opinion that its finding was flagrantly against the evidence, he would have been justified in ignoring the verdict and entering a judgment to the contrary, unless he believed that, in spite of the finding of the jury, there was evidence of undue influence sufficient to justify him in entering a judgment canceling the certificates of stock in question on that ground. In the case of Ayres v. John Scott, 2 Ky. 162, it was held that, where a chancellor directed an issue out of chancery to be tried by a jury, he should confine the inquiry

cf the jury to the determination of the single point submitted, and, if more than one point was submitted, they ought to be specifically and particularly stated, and the jury in its verdict should be required to answer each point separately. And again, in the case of Petty v. Malier, 54 Ky. 591, it was held that, where legal as well as equitable matters of defense arise upon the issue in the case commenced at law, the legal issues should be tried by a jury, and the court may submit matters of fact arising upon the equitable issues to the jury where such equitable issues have not been transferred to the equity docket, and in such case the finding of the jury should be special to enable the court to decide the case. We know of no case where this court has ever expressed a contrary view, and, under the authority of the rule announced in those cases, the chancellor erred in directing the jury to return a general verdict, but he should have required it to answer each of the questions submitted separately; that is, if he found that Patrick Bannon did not have sufficient mind to execute the papers, it should have said so in its verdict, and, likewise, if he was unduly influenced in the execution of same, it should have been required to say so—and upon another trial he will submit these questions to the jury, and require that they return a special finding as to each.

For the reasons indicated, the judgment in each of the foregoing cases is reversed, and the cases are remanded for a new trial and further proceedings consistent with this opinion.

ON PETITION FOR MODIFICATION.

In the petition for a modification of the opinion rendered herein, our attention is called to the con-

flict between this case and the case of Swinebroad v. Bright, 116 Ky. 514, 76 S. W. 365, 25 Ky. Law Rep. 742, on the question of the competency of the evidence of certain of the litigants relative to conversations had by them with their father and statements made by him in their presence. The opinions are irreconcilable on this point, and both can not stand. After full consideration, we adhere to the rule announced in the Swinebroad Case, and now withdraw so much of the opinion as holds the testimony of those of the appellees who undertook to detail conversations with and statements made by their father competent. On another trial this testimony will be rejected, as it was in the lower court in the first trial.

Petition for rehearing overruled.