### Burley Tobacco Growers' Co-Operative Association v. Devine, et al.

(Decided December 17, 1926.)

## Appeal from Boyle Circuit Court.

1. Trial—Case Involving Only Injunctive Relief Held Erroneously Transferred to Common-Law Docket.—Where action by co-operative association is merely for injunctive relief, proper practice is to order an issue out of chancery and submit to jury only questions of fact, with directions to answer each question separately, and transferring case to common-law docket was error.

2. Appeal and Error—Jury's Verdict on Question of Fraud in Case Involving Only Injunctive Relief is Not Conclusive.—Question of fraud in case involving only injunctive relief is not legal issue as to which verdict of jury is conclusive, unless flagrantly against evidence.

3. Agriculture—Agreement for Raising Tobacco by Child of Member of Growers' Association Held Device to Nullify Member's Agreement with Association.—Agreement between landowner and daughter of member of tobacco growers' association, whereby daughter raised tobacco, using father's equipment, held merely a device to nullify member's agreement with association.

4. Equity—Equity Regards Substance, Not Form.—Court of equity regards substance, and not form.

5. Agriculture—Member of Tobacco Growers' Association May Not Escape Liability by Raising Crop in Name of Another.—Member of tobacco growers' association may stop raising tobacco, but he

must act in good faith, and will not be permitted to escape liability to association by merely raising tobacco in name of some one else.

ROBERT H. HAYS, CHENAULT HUGUELY and C. C. BAGBY for appellant.

HENRY JACKSON and M. C. MINOR for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

This is an action by the Burley Tobacco Growers' Co-operative Association against Andrew Devine, a member of the association, and his daughter, Bee Devine, to enjoin the sale and delivery to anyone other than the association of 5,000 pounds of tobacco raised in the year 1925 on the farm of F. Fox Caldwell. The petition proceeds on the theory that the tobacco was produced by and for Andrew Devine under an agreement made in the name of his daughter for his sole use and benefit, and that his daughter had no interest in the tobacco. The defense was that the contract between Miss Devine and Mr. Caldwell was made in good faith and that she and not her father was the owner of the tobacco. The Boyle circuit court refused to grant a temporary injunction, but on application to Judge Sampson, a member of this court, the Boyle circuit court was directed to grant a temporary injunction, and this order was concurred in by all the judges of this court.

When the cause came on for trial on its merits Miss Devine moved the court to transfer the case to the ordinary docket for a trial of the following issues, to-wit: (1) Whether the tobacco was raised by and for Andrew Devine, or was raised for Bee Devine. (2) Whether in the agreement with Mr. Caldwell Andrew Devine or Bee Devine was the real party in interest. (3) Whether the contract was made in good faith, or was fraudulent and the tobacco was in truth raised for Andrew Devine and that Bee Devine had no interest therein. Evidence was heard and the issues were submitted to the jury by the following instruction:

"If you believe from the evidence in this case that the contract introduced in the evidence in the name of the said Bee Devine and Fox Caldwell, for the production of tobacco, was in good faith and the tobacco produced was in good faith that of Bee

Devine, and that it was not made and entered into for a fraudulent purpose of avoiding Andrew Devine's contract with the Burley Pool, and that Andrew Devine had no interest in the tobacco and no control over it except as the agent of Bee Devine, you should find for Bee Devine. Otherwise you should find for the plaintiff, Burley Tobacco Growers' Co-operative Association.

"If you find for Bee Devine, you will say in your verdict, 'We, the jury, find for Bee Devine.'

"If you find for the Burley Tobacco Growers' Co-operative Association, you will say in your verdict, 'We, the jury, find for the Burley Tobacco Growers' Co-operative Association.'"

The jury found for Bee Devine. Thereupon the chancellor, after consideration of the testimony, verdict of the jury and the whole record, refused to grant either a temporary or permanent injunction, and adjudged that the petition be dismissed. The association appeals and its motion, upon consideration by the whole court, to continue the injunction in force pending the appeal, was sustained.

The only witnesses heard by the jury were Andrew Devine and Miss Devine, who testified orally, and F. Fox Caldwell who testified by deposition. Briefly stated Andrew Devine's testimony is as follows: He owned a farm of 64 acres and was engaged in the dairy business. He had been raising tobacco off and on for 30 years. He was a member of the burley pool and signed its contract in 1921. He raised a crop of tobacco that year on Mr. Caldwell's place and delivered it to the pool. He raised another crop in the year 1922 on Mr. Caldwell's place but disposed of it over the loose leaf floor. In 1923 he raised another crop, which he delivered to the pool. He raised another crop in 1924, which he did not deliver to the pool, but sold it on the loose leaf floor. The association filed a suit against him for the nondelivery of the 1922 and 1924 crops, and he paid the damages and costs. After that he announced to Mr. Caldwell that he was not going to grow any more tobacco. When he mentioned that fact at home his daughter said: "Father, let me grow that crop of tobacco." She said: "You see Mr. Caldwell for me. Would you let me have your barn and teams and tools and sticks when you are not using them, the same as

anybody else?'' Devine said, ''Yes, do you think you could handle it?'' She said, ''Yes.'' Her mother spoke up and said, ''You are not going to grow tobacco and work for the railroad?'' Her daughter replied, ''Mother, I will come home and stay with you during the tobacco season,'' and she did. In explaining the situation to Mr. Caldwell he said, ''Yes, I will let her grow it.'' Mr. Caldwell drew up the contract for two years and his daughter signed it. His daughter was not present while he and Mr. Caldwell were talking. Prior to that time he had raised tobacco on Mr. Caldwell's land for two years and had superintended those crops. After the contract was made in his daughter's name, he looked after and superintended the planting of the bed. He used his own setter, which he had at home. He used 100 yards of canvas, which he had and bought 200 yards more for his daughter. She made it and paid for it. In setting out the plants he used his own setter part of the time and he used the team of a man by the name of Field part of the time. He was there and looked after the setting ''a little.'' At that time his daughter was working for the railroad in Somerset. His plow turned the tobacco. His team pulled the plow. The tobacco was double-cut with a disc harrow, which he owned and his team pulled the harrow. One day John Merricks cut a portion of the tobacco and he paid him for it out of his own money. The tobacco was hoed by two colored men and he paid them out of his own pocket. The tobacco was suckered by the same men. From the time the tobacco was set until the tobacco was cut his daughter was never in the bed. He had five or six hands engaged in cutting and housing the tobacco. The tobacco was housed on his place and in his barn. His sticks were used in hanging it up. The tobacco was hauled from Caldwell's to his farm by his wagons and by a hired wagon. His team and the team belonging to a man by the name of Steele were used in hauling it. He reckoned he looked after the opening, closing and ventilating of the barn while the tobacco was being cured. The tobacco was stripped by a negro and by a white fellow that lived on his place. He was sometimes around the barn while it was being stripped. He was there part of the time when the tobacco was bulked. His daughter had been working for the Southern Railway Company as stenographer for six

or seven years. His daughter got a leave of absence during the summer of 1925 and came home about the first of June. She stayed about three months. While there she helped with the cooking and general housework. Mrs. Devine was not extra well then. The only part that his daughter took in growing the tobacco was to help do all the work at the house and give one regular hand on his place his breakfast and dinner. Prior to that time his daughter had never had any experience in growing tobacco. She never owned any land, teams, barns, implements or canvas. His daughter had never paid him for the use of the teams, tools and implements which he furnished. Under the arrangements with Mr. Caldwell he was to get two-fifths and his daughter three-fifths. On cross-examination he testified as follows: He had satisfactory reasons for not wanting to raise any more tobacco. When he dumped his tobacco he reported to the pool and offered to pay them. The pool then sued him and received the same amount besides making him pay the costs. He sold because he could not raise the tobacco without getting pay for it. He agreed to let his teams be used by his daughter when he could spare them. His daughter was at home when she signed the contract. The reason she came home was to be there during the busy part of the tobacco season. He did not know of any reason why his daughter could not make the contract, or of any reason why he should not let her have the barn that was already there. His daughter had a settlement with him for money that he had paid out along the first of June. She paid him for the tobacco canvas, for the setting of the tobacco and for his work in cutting up the wood, burning the beds, up until they commenced plowing and hoeing the tobacco. He did not know that she ever paid any hands. He had no interest whatever in the contract or the tobacco or its proceeds. He was in no way responsible for carrying out the contract with Mr. Caldwell. The bed that he prepared for the tobacco was on Mr. Caldwell's place near the patch. This was about a mile and a half from his land.

The evidence of Miss Devine is as follows: She had been working for the Southern Railway as stenographer since 1918. She first worked at Danville for two years, then went to Somerset, where she remained for three and a half or four years. She moved from Somerset to Chat-

tanooga in October, 1925. She came home the last two weeks in May on her vacation and then got a leave of absence on the first of July. Her present compensation was $130.00 a month. Prior to her contract with Mr. Caldwell she had never had any experience in raising tobacco. She owned no land, teams or implements, no barns or anything of the kind. She was not present at the time of the negotiations between her father and Mr. Caldwell. When she returned on July 1st she kept house for her mother. She returned because she had to. She was never in the tobacco patch or around the plant beds. She never had anything to do with supervising the crops, telling the hands what to do or how to raise it. She never told them how to cut it or how to house it and never gave them any directions about setting it. She depended on the colored man, who worked for her, and on her father. When she came home she talked to her father about the crop. When she came home in June she settled with her father for all that was due up to that time. It was right close to $60.00. She had not settled with him since. Since that time she had not had anything to settle with and had not paid for the stripping, cutting, housing, hauling or for the use of the barn. She felt that she was under obligations to pay her father for the use of his teams, barns and implements and was going to pay him for it, a fair and reasonable price. On cross-examination she identified the contract which she had made with Mr. Caldwell. By that contract Caldwell rented to her seven acres of sod land to be planted in tobacco for two years. She was to furnish barn, sticks, labor, teams, tools and money necessary for handling the crop, and was to receive three-fifths of the crop and Caldwell two-fifths. She agreed to put his two-fifths on the People's Independent floor free of charge. She assisted her mother while the tobacco was being raised. At that time she wanted to engage in work at Danville. She proposed the contract. She did it because her father was talking of renting the barn out. Her father had no interest, directly or indirectly, in the tobacco. The tobacco was owned by her alone. The tobacco was then on her father's farm and ready for market. She insured the tobacco against fire and tornado. The policy was taken out the night they put the tobacco in the barn. There was never any understanding other than that stated in the contract. She signed the contract at her father's home. Mr. Caldwell sent it by her father.

Mr. Caldwell testified as follows: He entered in the contract with Miss Devine to raise and produce about seven acres of Burley tobacco on his farm for the season 1925-1926. Early in the year 1925 Mr. Andrew Devine came to him, stating that he had been badly treated by the Burley Tobacco Association and that he would never raise another pound of tobacco for that association. Andrew Devine said that his daughter, Miss Bee Devine, was going to quit the employ of the Southern Railway and that she would be in shape to look after the raising of another crop of tobacco. He wanted to know if he would be willing to rent her about seven acres of sod land upon the same terms that he rented to him in 1922 and 1923. Devine said, "If you are willing to rent to my daughter on those terms, the same as you rented to me in 1922 and 1923, draw your contract embodying the same terms and mail it to me. My daughter will sign it and mail it back to you." This was done. Miss Devine was never present at any of the negotiations. There was only one talk between him and Andrew Devine. On cross-examination he stated that his contract was with Miss Bee Devine alone. He had no contract whatever with Mr. Devine. Mr. Devine had announced that he did not intend to raise any more tobacco. The land on which the tobacco was raised was not in the pool. Miss Devine alone was liable under the written contract. So far as he knew there was no bad faith in the transaction. He did not recall whether Mr. Devine stated that he was coming at his daughter's request, though he may have done so.

This is not a case where other than injunctive relief was asked and the injunctive relief was merely ancillary to the main relief. It is a case where the only relief sought was an injunction restraining appellee from delivering the tobacco outside of the pool. The right to this relief depended on whether the contract with Mr. Caldwell was made in good faith or was a mere device on the part of Andrew Devine to avoid his obligation to the association. In other words, the principal issue was one of good faith or fraud, and therefore not a purely legal issue, but an equitable issue. The action being purely equitable, though depending on two or more equitable issues of fact, it was error on the part of the chancellor to transfer the case to the common-law docket, with di-

rections to the jury to return a general verdict. The proper practice in such a case is to order an issue out of chancery and submit to the jury only the questions of fact, with directions to answer each question separately. Ayers v. John Scott, 2 Ky. 162; Petty v. Malier, 54 Ky. 591; Bannon v. Patrick Bannon Sewer Pipe Co., 136 Ky. 556, 119 S. W. 1170; Consolidation Coal Co. v. Vanover, 166 Ky. 172, 179 S. W. 43. But, passing this phase of the case, and assuming that the verdict of the jury was equivalent to a finding that the contract was made in good faith, it must not be overlooked that in a case like this the question of fraud or good faith is not a legal issue as to which the verdict of a jury is conclusive unless flagrantly against the evidence, but a purely equitable issue, which the chancellor or this court may disregard and enter judgment in accordance with his or its view of the evidence. Of course, where the evidence is conflicting, we are inclined to give considerable weight to the verdict of the jury when confirmed by the chancellor, but here there is no conflict whatever in the evidence. Indeed, the only witnesses were Mr. Devine and his daughter, and Mr. Caldwell, who had no means of knowing what took place between them. In order that the situation may be thoroughly understood we have set forth at length the evidence given by Mr. and Miss Devine. It discloses without contradiction the following situation: Mr. Devine had been engaged in raising tobacco for a great many years. He signed a contract with the association. After becoming a member of the association he dumped two of his crops and had to pay damages. Being dissatisfied with his membership in the association, and with the action of the association in requiring him to pay damages, he announced that he would not raise any more tobacco. Miss Devine, who then was employed as a stenographer by the Southern Railway Company at Somerset, Kentucky, who had never raised a crop of tobacco, and who could not carry out the contract without the aid of her father, suggested that she make a contract with Mr. Caldwell. Even her mother said that she could not do this as she was working some distance away. Mr. Devine then went to Mr. Caldwell, from whom he had been renting for a number of years, and had the contract drawn up between Mr. Caldwell and his daughter. From that time on Miss Devine was never in the plant bed, the tobacco patch or the barn where the tobacco was housed,

and never employed any hands or gave any directions as to how the tobacco was to be raised. Though she came home during the summer, all that she did was to assist her mother, who was not very well, in looking after the cooking and housework. The only hand that she ever prepared any meals for was a general hand who worked on her father's place and occasionally went to the tobacco patch. Nothwithstanding the fact that the contract was made in his daughter's name, Mr. Devine furnished the labor, teams, tools, barn and sticks necessary for handling the tobacco, and superintended the planting of the bed, plowing of the ground, the setting out of the plants, the hoeing, cutting, and the housing of the tobacco on his farm. Not only so, but he paid all the hands, and, at the time he testified, he had only received from his daughter the sum of $60.00. In other words, the only difference between the steps taken by him in raising prior crops and in raising the crop in question was that the contract for the crop in question was made in the name of his daughter. A court of equity regards substance and not form. Can anyone think for a moment that this arrangement would have been resorted to had it not been for the fact that Mr. Devine was a member of the pool? If it be once established that the statute and the pooling agreement made pursuant thereto may be defeated by an arrangement like this, then the whole plan of cooperative marketing is at an end. Looking at the transaction in the light of all the circumstances there is no escape from the conclusion that the agreement in question was a mere device adopted for the purpose of enabling Mr. Devine to raise tobacco in his daughter's name, and thereby nullify his agreement with the association. Of course, a pool member may stop raising tobacco if he so desires, but he must act in good faith, and will not be permitted to escape liability to the association by merely raising the tobacco in the name of some one else.

Wherefore, the judgment is reversed and cause remanded, with directions to grant a permanent injunction in accordance with the prayer of the petition.