## Thomas O. Phillips, Exor., et al. v. Phillips, et al.

## Same v. Same.

(Decided June 21, 1912.)

### Appeal from Marion Circuit Court.

1. Wills—Contest—Immoral Acts of Devisee—Evidence of.—In a will contest, evidence of particular immoral acts of a devisee is not admissible.

2. Wills—Contest—Fraud—Evidence of—Sufficiency.—In a will contest, evidence of fraud examined and held insufficient to take the case to the jury on that issue.

3. Wills—Contest—Testamentary Incapacity—Evidence of—Sufficiency.—In a will contest, evidence of testamentary incapacity examined and held insufficient to take the case to the jury on that issue.

4. Wills—Contest—Undue Influence—Evidence of—Sufficiency.—In a will contest, evidence of undue influence examined and held sufficient to take the case to the jury.

5. Wills—Contest—Evidence.—In a will contest, where there is evidence tending to show that one of the devisees made statements to the testatrix with reference to certain acts of impropriety on the part of his sister, who was omitted from the will,

evidence that the sister was not guilty of such acts of impropriety is admissible for the purpose of showing the falsity of the statements.

H. S. McELROY, S. A. RUSSELL, W. C. McCHORD and W. W. SPALDING for appellants.

H. W. RIVES, H. P. COOPER and ROBERT HARDING for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

These two appeals grow out of a contest over the will of Eusebia Phillips, who died a resident of Lebanon, Kentucky, and will be considered together. The will was probated by the Marion County Court. On appeal to the Marion Circuit Court, the jury found the will offered for probate not to be the last will and testament of Eusebia Phillips. The first case mentioned in the caption (No. 68) is an appeal by the executors and devisees of the will, from the judgment predicated on the verdict. During the progress of the action, the executors and devisees filed their petition asking that the verdict and judgment be set aside for the various reasons therein stated. A demurrer was sustained to the petition, and the petition dismissed. From that judgment appeal No. 69 was prosecuted.

The will in question is as follows:

"I. Eusebia Phillips, of Lebanon, Marion county, Kentucky, make this my last will and testament, hereby revoking all wills heretofore made by me, and by which I dispose of my entire estate.

"Item 1. It is my will that all my just debts be paid, which indebtedness includes the amounts agreed to be paid to my children, Emma Hundley and Thomas O. Phillips, to equalize them with my son John B. Phillips, in the distribution of the estate of my deceased husband, James G. Phillips, as stated in written contract, dated the .. day of January 1908, which contract is referred to and made a part of this will, and which contract is now ratified and confirmed. It was my purpose to equalize my daughter, Bird Phillips, in the same way, but she refused to become a party to said agreement, and, therefore, and for other reasons which are best known to me, it is my will that my said daughter,

Bird Phillips, and my son, John B. Phillips, shall not have or take any part of my estate.

"Item 2. To my son, Thomas O. Phillips, I devise my residence and the lot upon which it is situated on Main Street in Lebanon, Ky., and which is bounded on the southeast by Main Street, and on the southwest by Martin Spaulding's lot, on the northwest by Charles Caskey's lot; on the northeast by Emma Hundley's property, together with all my household and kitchen furniture, silver-ware, glassware, china, books, pictures, carpets, rugs, curtains, bed clothing, and such other property as may be in said residence, other than money, notes, stocks, bonds and the piano.

"Item 3. I bequeath the Trustees of the Methodist Church (South), of Lebanon, Kentucky, the sum of One Thousand Dollars ($1,000.00) in trust, which sum shall be safely invested by said Trustees, and the interest or income therefrom shall be paid, as collected, on the salary of the pastor of the Methodist Church.

"Item 4. To my grandchildren, Eusebia Phillips, James Phillips, Julia Hundley, Joseph Hundley, and Phillips Hundley, I bequeath to each of them Five Hundred Dollars ($500.00).

"Item 5. To my niece, Eusebia Robards, I bequeath my piano.

"Item 6. To my sister, Mrs. Augusta Robards, I beqeath the sum of One Thousand Dollars ($1000.00).

"Item 7. To my son, Thomas O. Phillips, I bequeath the sum of Two Thousand Dollars ($2000.00).

"Item 8. The remainder of my personal estate and the proceeds of such of my real estate as is directed to be sold by item 9 of this will, I devise to my son, Thomas O. Phillips, and to my daughter Emma Hundley, equally.

"Item 9. My executor, hereinafter named, is authorized and empowered to sell in such manner as he may deem best any undevised real estate that I may own at the time of my death, and distribute the proceeds among my residuary devisees, as stated in Item 8 of this will; and said executor is authorized to make conveyance thereof with such warranty as my title to such real estate may authorize.

"Item 10. I appoint my son, Thomas O. Phillips, of Lebanon, Kentucky, as executor of this will.

"In testimony whereof, witness my signature, this the 31st day of March, 1908.

"EUSEBIA PHILLIPS.

"Witnesses

"J. A. KELLEY,
"W. C. ROGERS,
"W. C. McCHORD."

The evidence shows that the testatrix, Mrs. Eusebia Phillips, died during the month of July, 1910. Her will, therefore, was executed more than two years before her death. The testatrix was the wife of James G. Phillips, who died in the year 1907, possessed of a large estate. There were born to them four children, to-wit; John B. Phillips, Emma Hundley, wife of E. N. Hundley, Thomas O. Phillips, and Bird Burton Phillips, all of whom were of age when testatrix executed her will. The testatrix inherited from her father an estate of about $18,000. She inherited from her husband about $40,000. At the time of her death, her estate amounted to between $53,000 and $55,000. It will be observed that by the will in question she did not give any of her estate to her daughter, Bird Phillips. She did give to the two children of her son, John, the sum of $500 each. The contestants are Bird Phillips and John B. Phillips.

During their early life, the testatrix and her husband became estranged, and for a number of years prior to her husband's death, they had not spoken except upon matters of business.

James G. Phillips, after providing that his wife, Eusebia Phillips, should have her distributable share in his estate, devised his estate equally to his four children, subject to certain advancements. At the time of his death, he had advanced to John B. Phillips, $25,455; to John B. Phillips' children, $10.000; and to John B. Phillips' wife, $9,000. In addition to this, he had given John B. Phillips $5,000, which the latter claims as compensation for services rendered by him to his father in procuring the dismissal of the suit filed against his father by his mother, which will hereafter be noticed, and for services to his father during his last illness. He had given to Thomas O. Phillips $23,000; to Emma Hundley $10,000, and to her children, $10,000; to Bird Phillips, $15,000.

During the latter part of December, 1906, Mrs. Eusebia Phillips arranged to visit her sister at Hender-

sonville, North Carolina. A short time before her departure, John B. Phillips took his father to his home. While there, he obtained large sums of money from his father. His father was very deaf, and could only see by the aid of a magnifying glass. Believing that her husband, James G. Phillips, was giving away his property to such an extent that she would be deprived of her dower rights therein, Mrs. Eusebia Phillips had her attorney prepare a suit to enjoin her husband from disposing of his property, and to have a committee appointed to take charge of the estate. This suit was prepared. Later on it was ascertained that James G. Phillips had given to his son, John, two checks for $5,000 each, and thereupon the suit was filed. Soon after the suit was filed, John made a trip to North Carolina to induce his mother to withdraw the suit. For the purpose of influencing her in this respect, he stated to her that his father had told him that if the case was pressed he would bring into the suit an old scandal reflecting on Mrs. Phillips, but for which there seems to be no foundation. Mrs. Phillips agreed that if he would not get any more money from his father, she would dismiss the suit. While there she received a telegram from Thomas O. Phillips, advising her not to sign anything for John. Upon John's return, the suit was dismissed. After that time however, he obtained $15,000 more from his father, and also had in his possession certified checks to the amount of $25,000. John claims that these certified checks were obtained for the purpose of preventing his mother and those co-operating with her from tying up his father's estate in the event that it was decided to file a new suit.

On December 9, 1907, a few days before the death of James G. Phillips, Mrs. Eusebia Phillips, Emma Hundley, Thomas Phillips and Bird Phillips sent a written notice to each of the banks of Lebanon, Ky., notifying them not to pay the certified checks.

After the death of James G. Phillips, contest proceedings were about to be instituted. Mrs. Eusebia Phillips was very anxious to prevent such proceedings. She had prepared what is termed in the record an "Equalization Paper," by which all of the children were to be charged with the advancements actually made to them or their families, and by which she agreed to equalize out of her estate those who had not received advancements equal to those which John B. Phillips had re-

ceived. Bird Burton Phillips was asked and urged to sign this paper. She declined to do so, except upon the condition that her mother would give security, and E. N. Hundley's accounts as agent of her father should be verified. This Mrs. Eusebia Phillips refused to do; so the equalization paper was executed by Mrs. Phillips and the other children, without Bird Phillips being a party thereto.

Some time previous to the execution of the will in question, Mrs. Phillips had executed another will by which she devised her estate in equal parts to her children. The equalization paper was signed on January 21, 1908.

Mrs. Eusebia Phillips' will was drawn and executed under the following circumstances: She sent for W. C. McChord, and told him she wanted him to draw her will. She spoke of the property that she had inherited from her father, and told him that she had gotten about $40,000 from her husband's estate. She told him that she had made up her mind not to leave anything to Bird and John, because of their treatment of her. She referred to the fact that Bird had dared her to leave her name out of her will, and if she did, Bird would make her turn over in her grave. She also referred to the fact that she was anxious to prevent litigation over the will of her husband, and that Bird had declined to sign the equalization paper unless she would give Bird security. She gave as a reason for leaving John out of her will the fact that he had told her that if she withdrew the suit against her father, he would not get any more money from his father, when as a matter of fact, he continued to, and did get large sums from his father. She then mentioned how she wanted her will drawn, naming the different devisees and the amounts to go to each. Mr. McChord prepared the will in accordance with her directions. He gave to the testatrix a copy of the will, which she kept in her possession for almost a month. She then handed it back to Mr. McChord, saying that she wanted Thomas O. Phillips one of the executors, in the place of J. A. Kelley. She also inserted the name of one of John Phillips' children. Taking the first draft of the will, the attorney prepared the final draft. The will was signed by the testatrix on each page thereof, as it was type-written. It was witnessed by Albert Kelley and W. C. Rogers. She suggested Mr. Kelley as one of the witnesses, and Mr. McChord

suggested Mr. Rogers. When these gentlemen came in, she laughingly said, "I want you gentlemen to come up here and witness my will, if you think I am competent to make a will." The will was not re-read to the testatrix, nor was it read to the attesting witnesses.

The will in question is attacked on three grounds; mental incapacity, undue influence, and fraud. The evidence for the contestants is as follows:

John B. Phillips, one of the contestants, testifies that his mother was a confirmed dyspeptic and a nervous woman. When in the presence of strangers she appeared cheerful; when at home with her family and her more intimate friends, she would betray her real condition. When suffering, she was fractious and unreasonable. There was an entire estrangement between her and her husband. Witness took his father to his home in order that he might receive better attention in the absence of his mother. His brother, Tom, told him that if his father attempted to give away any of his money, he, Tom, would bring suit to have the estate taken out of his father's hands. Tom also said that he would do all in his power to have his mother disinherit Bird. His mother told him of a scene between Tom and Bird when Tom forcibly removed Bird from his mother's room. She also told him of an assault made by Tom upon Bird in the dining room. His mother told him that Tom would come in at night beastly drunk, and his treatment of her would be unpleasant. His mother told him of the fact that Tom had been to Bardstown and had stayed all night at a boarding house there with a woman who had been working at Tom's store. Tom and the woman were both intoxicated, and when at a ball at Bardstown on the same evening, were removed from the ball room floor. His mother further told him that Tom had said to her that Bird had been in the habit of going to Louisville and imbibing in spirituous liquors to the extent of becoming riotous in the cafe of the Seelbach Hotel. She also told him that Tom had represented to her that Bird had gotten money to take trips on from "low-down men around the depot." When he would protest to his mother that these statements of Tom's were not true, she declined to believe him, as Tom's word with her was final. His mother also stated that she was afraid she would suffer bodily harm from Tom if she persisted in protecting Bird. His mother informed him that she had sent Tom to the Keeley Institute

at Crab Orchard, for treatment; also that she had had him sent to a sanitarium at Louisville. Just prior to Tom's departure for Louisville, he was in a state of imbecility. On one occasion, Tom Phillips came to his home bringing a bundle of letters he had gotten from Bird's trunk. At that time witness was not friendly with Bird, and Tom brought the letters to him in an effort to discover something of an incriminating nature against her. After his father's death, his mother stated that she did not go to his house, because if she did, "there would be no living in the house with Otho." His mother stated that E. N. Hundley and T. O. Phillips told her that he had gotten from his father's estate $60,000 more than his share. He tried to disabuse her mind of this impression, but was unable to do so. Upon one occasion he asked his mother how much she had received from his father's estate and she replied that she did not know. His mother had no more knowledge of figures than an infant. His mother would frequently ask him how much was due the servants, because she was unable to make the calculation. His mother said her estate was not sufficient to make up to Mrs. Hundley and Tom the deficiency arising from his having received more from his father's estate than he was entitled to. He asked his mother if she had waived any rights she had in his father's estate. She replied that she did not know whether she had or not. She had signed some papers that were prepared, but she did not know. His mother said all of her life she had been unable to understand figures, business papers, or anything of a business nature, unless it was of a very simple character. His mother stated on numerous occasions that no one could induce her to discriminate against any one of her children. She told him that Tom and Mrs. Hundley were insisting on her making a new will, because of the existence of the contract which had been entered into among the children. She did not know why it was, but they said it was necessary. Just a few days before his mother's death, she said, "My children have been at cross (indicating by crossing two of her fingers) over money affairs. There is now no further necessity for that, and I want them to live together in peace and harmony, and live on there and meet me in Heaven." Witness just happened to hear of his mother's illness; was not advised by other members of his family. He offered to sit up with his mother, and did sit up with her, on

two occasions. When he was there, Tom and Emma would not permit him to be in the room alone with his mother. When Mrs. Augusta Bird came, his mother was delighted to see her. As Mrs. Bird came up the walk, Mrs. Hundley said: "She need not think she is going to stay at our house. She'll not stay at my house." Emma complained bitterly of the fact that Mrs. Bird usurped the office of nurse. His mother told him that Bird had cost the estate of James G. Phillips $15,000 on account of litigation. On one occasion when he attempted to fix a pillow for his mother, Tom said: "Never mind; I can attend to this. I don't need any of your help." In his opinion, his mother did not have sufficient mind and memory to understand the nature and extent of her estate, to know the natural objects of her bounty, and her obligations to them, and to dispose of her estate according to a fixed purpose of her own. On cross-examination, witness admitted that when he took his father to his home, his sister Bird was denied admission to the room. His father was totally deaf, and his eye-sight was defective. Witness admitted getting the money shown by the equalization paper to have been received by him. His father gave him the $5,000 not only for getting the suit instituted by his mother dismissed, but because of his care and attention to his father. When some of the money was given to him by his father, it was withdrawn first from local banks and deposited in a bank in Louisville, and checks drawn on the Louisville bank in his or his family's favor. After the execution of the equalization contract, he tried to get his mother to execute a new contract with him, by which she was to indemnify him against any amount Bird Phillips might recover, as well as the cost of such litigation. Witness admitted that when he told his mother how much he had gotten from his father's estate, she became hysterical, and declared in a dramatic manner that she did not think that she had a child who would take that amount of money from her husband. His sister, Bird, was also dissatisfied because he had gotten so much money from his father.

Miss Bird Burton Phillips testifies that the relations between her father and mother were not pleasant. She tells of an occurrence that took place in the dining room on one occasion, when she asked Tom for the biscuits and he declined to pass them. She reached over to get the biscuits and Tom grabbed her by the hair. Her

mother tried to protect her. She ran out of the room; Tom caught her and beat her head against the banisters. After that time, the relations between Tom and her were very unfriendly. On another occasion in the dining room, Tom caught hold of her and pushed her out of the door. She caught her skirt in the door and had to slip out of the skirt in order to get away. On another occasion, Tom and Emma caught hold of her head and feet and put her out of her mother's room. Her mother said: "If that doesn't stop, it will kill me. Leave that girl alone." Tom said: "I am going to telephone for a policeman to come and arrest her." Witness then went down to Mr. Dan Howard's, where she had a total collapse. On another occasion, when she passed through the sitting room, Tom got up and flung her out of the door. On another occasion, when she was talking to her father, Tom attempted to pull her out of the room, and almost pulled her father out of the bed as she clung to him. She further testified that there was not a word of truth in the report that she had ever gotten money from anybody to take trips on, or that she was ever guilty of any impropriety in the Seelbach Hotel. Whenever she had her friends at the house, Tom would insult her. During his mother's illness, Tom acted as the head of the house. On another occasion, she found her trunk had been tampered with and a bunch of letters had been taken from it. During the years 1902 and 1903, Tom was intoxicated a great deal. Tom would frequently tell his mother that if she did not do certain things, he would leave the house, and her mother would generally do what Tom wanted. Her mother frequently said that "Tom was all honor, and she (the witness) was not fit to touch the hem of his garment." Her mother was never very well. When Mrs. Bird first came to the house, she was well received by her mother. Mrs. Bird afterwards returned. She heard Mrs. Hundley say that she did not know why Mrs. Bird would come, when she was not welcome. She overheard a conversation between Tom and Mrs. Bird, after Tom had told Mrs. Bird to leave, in which Tom said: Well, if you had been burnt by your father's will, you wouldn't want to be burnt by your mother's will." Tom further said: "We have seen it thus far, and we will see it through." Tom and Emma objected to a trained nurse during her mother's last illness, although the doctor said it would be a good thing. During her mother's last illness, her mother said that

all her children had been cross over money matters; then crossing her fingers, her mother said: "'Now, there is no reason for that, and I want them to live in peace and harmony and meet me in heaven." During her mother's last illness, either Tom or Emma would be in the room all the time, and objected to the others doing anything for their mother. The reason witness did not sign the equalization paper was that it contained a statement of Mr. Hundley's accounts as agent. She wanted some investigation made of his accounts. She also wanted some assurance that the contract would be carried out in good faith. After she failed to get security from her mother, or to have Hundley's accounts verified, she offered to sign the paper, but her mother said: "Tom and Emma will not permit me to let you sign it." She had heard Mrs. Hundley say that John had taken his father over to his home to get all the money he had, and if something was not done, John would get it all. After her mother's death, all the papers were removed from her desk. She asked her mother how much money she had gotten from her father's estate, and her mother said she didn't know. Her mother also stated that she had not gotten enough money out of her father's estate to equalize all the children with John. In her opinion, her mother, prior to March 31, 1908, when the will was signed, did not know the natural objects of her bounty, nor her obligations to them. Witness received $15,000 from her father prior to his death, and about $13,000 after his death. On cross-examination, witness stated that her mother was always very agreeable to strangers. Counsel exhibited to witness a piece of paper, on one side of which was the following: "There is not much happiness in the world." Witness said that it looked like her handwriting. On the other side of the paper was the following: "If I were you, I would divide it up before you die and keep Mother out." Witness admitted that it resembled her writing at one time, but claimed that it did not look like her writing then. Was unable to say whether or not the writing was hers. After her father's death, witness sought to be appointed administratrix of her father's estate, but was defeated in this purpose. She paid all the costs of the action herself. On one occasion, her mother told her that John had gotten about $60,000 from his father.

Len G. Edelen, another witness for contestants, testifies that at the request of Bird Burton Phillips, he went

to her mother some time after the equalization papers were signed, for the purpose of ascertaining whether or not Mrs. Phillips had left her daughter Bird out of her will. At that time Mrs. Phillips stated that she had not done so, and no one could make her discriminate between her children. One or two other witnesses testify to similar conversations with testatrix.

Some three or four witnesses testify to the occurrence at the boarding house in Bardstown on the occasion when Tom Phillips spent the night at the boarding house in the company of a woman claimed to be his wife.

J. C. Seelbach and others connected with the Seelbach Hotel, testified that Miss Bird Phillips was never on any occasion guilty of any acts of impropriety in that hotel.

Dr. Ed. Kelley testifies that he was Mrs. Eusebia Phillips' regular physician. He treated Mrs. Phillips' regularly for dyspepsia. Mrs. Phillips was of a nervous temperament. He also treated T. O. Phillips, who upon his advice, was sent to Dr. Board's sanitarium at Louisville. Mrs. Phillips told witness that T. O.'s condition was due to his having been drinking too much. One day Mrs. Phillips brought him a white tablet, which she said she had gotten from the bureau drawer in T. O. Phillips' room. She asked witness to examine it. Witness told her it might be one of a half dozen things. Mrs. Phillips wanted witness to examine it for the purpose of seeing whether or not Tom was taking anything. She cautioned him not to let Tom know she had asked him in regard to the tablet. During Mrs. Phillips' last illness, Tom and Mrs. Hundley had charge of the nursing, and he gave instructions to them. A trained nurse for Mrs. Phillips was talked of. Tom objected to having a trained nurse, because he and Mrs. Hundley would still have to supervise the nursing, even if a trained nurse was secured. On one occasion, Tom asked witness if he (Tom) had the right to tell Mrs. Bird to leave the house.

Mrs. Augusta Bird, a niece of Mrs. Eusebia Phillips, the testatrix, testifies to having gone to the Phillips home, where she was gladly received by Mrs. Phillips and the children. On that occasion, Mrs. Phillips said Mrs. Hundley was just as cross as a bear, except when she was having her own way. Afterwards, witness left and subsequently returned. One day Bird told Mrs. Phillips that the court had authorized the payment of an additional $500 to the attorney for the executors. As regards this statement, Emma said: "It is all a lie. There

is no truth in it. It is just one of Bird's lies. You know yourself that she will tell you anything in the world to worry you. What you ought to do is to put her out of the house and have nothing to do with her whatever." Witness asked Mrs. Phillips if she had made her will, and she said yes. There was nothing to worry about; that everything was fixed. Emma said: "You don't know anything about business." Mrs. Phillips said: "I may not know anything about business, but I know right from wrong, and the way I want my property divided." Mrs. Phillips further told her that she had agreed to draw up a paper equalizing her three other children with John, but for some reason Bird would not sign the paper. Of course, then she had to drop it. In answer to a question as to how much Mrs. Phillips got out of the estate, Mrs. Phillips said: "I don't know anything about business." Upon her return to the house, Mrs. Phillips asked witness to put a clean night dress on her. Witness could not find the key to the wardrobe. Tom said: "I have the key. We have to keep everything locked up in the house in order to keep Bird from stealing everything Mother has." At that time, she gave Mrs. Phillips an alcohol bath. In the afternoon Mrs. Hundley was angry because the bath had been given, claiming that the smell made her mother sick. Subsequently, she was invited by Tom to leave the house. On that occasion Tom said: "Cousin Gus, you see a play going on here, and we intend that you shall leave and leave at once. We understand these parties better than you do, and their movements, and we intend that you shall leave here. You are an innocent party, and I am just saying this to you as a little warning." Tom further said: "Cousin Gus, it is just this way: If you had been burnt by your father's will, you wouldn't want to be burnt by your mother's."

Mr. T. L. Edelen testifies that he advised Miss Bird Phillips not to sign the equalization contract until it was ascertained that Mr. Hundley's accounts as agent were correct.

Mrs. Russell, wife of Judge Russell, testifies that her husband was conducting a suit brought by Mrs. Phillips against her brother, who was the trustee. That in discussing figures and papers in the case, Mrs. Phillips did not seem to grasp the legal terms, or to understand the figures. Mrs. Phillips stated at the time that she didn't know how to compute interest. The cross-examination

developed that the accounts were rather complicated and not easily understood.

Briefly stated, the evidence for the contestees is as follows:

T. O. Phillips testifies that for a number of years he suffered from stomach trouble, rheumatism and neuritis. His eyes were also affected. He denies any mistreatment of his sister; on the contrary, he says that while he conducted a store, his sister was permitted to get what she wanted out of the store without paying for it. After he discontinued his store, his sister said: "There is no chance to get anything more from you. I want you to know I have hated you all the time." In regard to the occasion when he and Mrs. Hundley put Bird out of his mother's room, he says that Bird was engaged in talking to his mother in a loud and abusive manner. His mother asked him to remove Bird from the room. Thereupon, Bird lay down on the floor. He and his sister, Emma, took her by the head and heels and placed her in the other room. He denies that his mother told him that if they didn't stop it would kill her. His mother related to him an incident in regard to her silk underskirt, and Bird's taking it from her wardrobe. His mother walked into Bird's room and got the skirt. Bird, hearing her mother in the room, said: "What did you mean by going into my room?" Her mother started down the steps, and Bird pushed her in the back on the second or third step, causing her to fall. Witness frequently told Bird that there was no occasion for any turmoil between them, but she never would accept his view of the situation. On another occasion, his mother desired a glass of milk. Bird kept her milk in a separate pitcher. His mother poured out a glass of Bird's milk. Bird objected to her mother drinking the milk, and took the glass of milk her mother had poured out, and poured it back into her own pitcher. Her mother said: "Bird, it is a shame for you to do me this way, when you know it is all I have to eat for my supper." On one occasion, he heard Bird talking to her father about distributing his estate. After this conversation, he went into his father's room and found a paper containing the writing "If I were you, I would divide it up before you die to keep mother out." The only way any one could communicate with his father was by writing. The paper was in Bird's handwriting. After their father's death, John Phillips came to his mother's house only on two occasions. During his lifetime, his father

was very disagreeable to his mother. When his mother departed for North Carolina, he told her not to file suit against his father, but to await developments. He afterwards ascertained that his father was drawing considerable money out of the bank, and advised that suit be brought. The purpose of the suit was to prevent his father from disposing of all of his estate in fraud of his mother's rights. After his mother's return from North Carolina, she told him that John had deceived her. His relations with his mother were always pleasant. His mother never on any occasion pulled him up the steps. During his mother's last illness, Mrs. Augusta Robards, his mother's sister, Mrs. Hundley and Mrs. Schultz, his mother's first cousin, and he did all the nursing. Neither he nor his sister, Mrs. Hundley, were always in the room, but were always in calling distance. Neither he nor Mrs. Hundley prevented Bird from waiting on his mother. The reason he and Mrs. Hundley advised Mrs. Bird to leave was because of the fact that Mrs. Bird had given his mother an alcohol bath at a time when she was very sick and nervous, and the alcohol made her very sick at the stomach. Mrs. Bird's presence was unfitting his sister Emma for her duties as nurse. It was difficult to entertain a guest and at the same time to wait properly on his mother. There were sufficient persons present to wait on his mother without Mrs. Bird. Witness denied having made any statement to Mrs. Bird in regard to a play going on, or with reference to his having been burnt by his father's will. While Mrs. Bird was there on one occasion she told Mrs. Eusebia Phillips that she could not see how Mrs. Phillips could live in the house with Bird. After the equalization papers were signed, witness went to Hot Springs, Arkansas. He knew nothing of the will prepared by Mr. McChord. Never at any time made any suggestions to his mother in regard to the distribution of her estate. He never knew that Mr. Kelley and Mr. Rogers were at his mother's home to witness the will. In fact, knew nothing at all in regard to the will. Was present when there was a discussion in the family of the amount of the estate John and his family had gotten from his father. It was there stated to be about $50,000. His mother was a sensible, intelligent woman. She often spoke of the property that she had. She made contracts with reference to the monument for their father, and for certain improvements in the house. She did this without any assistance of anyone. Wit-

ness denies having assaulted his sister, or of attempting to drag her out of his father's room. When his mother was discussing with Bird the signing of the equalization paper, Bird demanded that his mother give her guilt edged securities as a guarantee that her mother would carry out the contract. His mother said: "Well now, Bird, if you don't sign this contract, and proceed in this litigation contrary to my wishes, what reason have you to believe that I will leave you anything in my will?" Bird replied: "I dare you not to leave me my part of your estate. Do you think Pappy is resting in his grave when I employed Mr. Cooper to keep him turning in his grave? And I also have him employed to keep you turning in yours if you do not give me my part of your estate." Witness never told his mother that John B. Phillips had gotten $60,000 more than his share of his father's estate. He never at any time told his mother not to permit Bird to sign the equalization paper. The statement made by his mother in the presence of her children and Dr. Baird was as follows: "Well, the children have been crossed in money matters (indicating by crossing her fingers), and it ought not to have been, and I hope they will live better lives and meet me in heaven." Witness denied that he ever told his mother that Bird had cost the estate $15,000 in litigation. Never mentioned any sum that his sister Bird had cost the estate except W. W. Spalding's fee. Witness never abstracted any letters from his sister's trunk.

Mrs. Hundley's evidence is substantially the same as that of T. O. Phillips. On one occasion her mother asked where Bird had gotten the money to take a certain trip. Witness told her that she had lent her $100 to take the trip. Never heard her mother speak of Bird getting money from low down men to take trips on. Her mother told her of being injured by Bird at the time of the dress skirt occurrence. Bird would frequently get angered at her mother and upbraid her. Her mother would say: "Oh, Bird, do let me live in peace. I haven't got long to live; let me live in peace." Bird said: "Peace nothing! I will see that you live in hell the balance of your days." Her house being next door, she frequently heard Bird talking in a loud and abusive manner to her mother. On one occasion, her mother told her that Bird had said to her: "You have lived long enough. Your days of usefulness are over. Why don't you get out of the way and go off and die, so I can get your money? You have never

let me have any of it while you were living, so why don't you get out of the way?'' After her mother's return from North Carolina, she ascertained that John had not kept his promises, and her mother seemed to regret that she had dismissed the suit. Witness agreed with her that it might have been better to go on with the suit. The reason they didn't have a trained nurse for her mother was that her mother objected to it. The doctor stated that it was necessary that her mother be kept perfectly quiet, and they agreed it was best for Mrs. Bird not to be there as she was the disturbing factor, and wanted to take charge of everything. Witness never knew of her mother having made the will in question, and never attempted to influence her in any way.

Mrs. Schultz, who was present during the last illness of Mrs. Phillips, corroborates T. O. Phillips and Emma Hundley.

Some twelve or fifteen witnesses who had known Mrs. Phillips all of her life, testify to her being a woman of fine sense and intelligence.

Dr. C. H. Prather, the Methodist minister at Lebanon, testifies that he urged Miss Bird to sign the equalization contract, and Miss Bird said she would not do it, because she had no confidence in her mother. She also stated that she would sue till she made her mother turn over in her grave.

Several witnesses testified to the fact that Mrs. Phillips told them, after Bird refused to sign the equalization paper, that she did not see how she was going to give Bird anything after she was gone.

Rev. W. T. Baird, pastor of the Methodist church at Lebanon, testified that he was in Mrs. Phillips' room during her last illness, and Mrs. Phillips asked him to pray. Mrs. Phillips said: ''Pray. My children are all here, and they are all crossed—just like this (indicating by crossing her fingers), Brother Baird, and they don't need to be, or they ought not to be. I want them all to meet me in heaven.'' And the nearest one of the children said: ''We will try, Mother.''

Judge Thurman testified to having drawn the first will for Mrs. Phillips, and to the fact that she was a woman of fine sense and intelligence.

In addition to the facts heretofore stated with reference to the execution of the will, it also appears from the testimony of W. C. McChord that when he left to get Mr. Kelley and Mr. Rogers to witness the will, he told

Mrs. Phillips to read the will over carefully while he was gone. When he returned he asked her if she had read it and she said yes.

Several witnesses testify to the fact that Mrs. Phillips stated to them that she had changed her will.

It further appears that James G. Phillips' will and codicils were probated on condition that John B. and Owen D. Thomas, the nominated executors under the codicil, would decline to act, and that W. C. Rogers and J. A. Kelley, the president and cashier of the two banks of Lebanon, were to be appointed administrators of the estate with the will annexed. When it was attempted to carry out this agreement Bird Burton Phillips objected, and demanded that she be appointed administratrix of the estate. The court overruled her motion, and appointed Rogers and Kelley. She appealed to the circuit court. Her appeal was dismissed. From that judgment she appealed to this court, where the judgment was affirmed. It also appears that in the suit brought by Rogers & Kelley, as administrators with the will annexed, to settle the estate of James G. Phillips, Bird Phillips raised numerous objections, and involved the estate in considerable litigation, all of which was decided adversely to her.

At the outset appellants insist that the judgment is erroneous because the special judge appointed by the Governor to try the case had no authority to act after the expiration of the term for which he was appointed. It appears that the regular judge, who was notified that he would be called as a witness, declined to try the case. This fact was certified to the Governor, who appointed Hon. W. P. Sandidge as special judge to try the case. Judge Sandidge assumed the bench on February 16th, a day in the January term. He then continued the case until a special April term. When the case was called at the special April term it was continued until a special June term, beginning June 27th. The trial then took place. Judge Sandidge continued to act under the original appointment of February 16th. No new appointment or designation was made. Objections were made to the action of Judge Sandidge in trying the case. The objections were overruled and exceptions saved. It is argued that as the act of 1910, known as the "Special Judge's Act," provides that the Governor, upon notification by the clerk of the court where the action is pending, shall immediately notify one of the circuit judges

who is not then engaged in holding a regular or special term of court in his district, and that it shall be the duty of such circuit judge so notified by the Governor to hold the court and try the case, the language of the act plainly indicates that such appointment is good only for the time that the special judge so appointed is not engaged in holding a regular or special term of court in his district. It is further argued that this contention is supported by the fact that the clause in the preceding acts, giving the special judge the power to call a special term of court for the trial of a case, is omitted from the act of 1910. In this connection it is also insisted that this view finds additional support in the language of the opinion in Dial v. Commonwealth, 143 Ky., 119, where it was held that though a special judge's powers were not necessarily ended with the termination of the court or the entry of a judgment in the case, but that he might make such orders or perform such acts in vacations for the completion of his records or the enforcement of his judgments as a regular judge might perform in vacation, yet his original designation or appointment gave him no power to retry a case that had once been tried. While it may be true that the original appointment is based upon the fact that the special judge is not then engaged in holding court, yet in view of the fact that he is given all the powers of a regular judge, and therefore the power to call special terms, we conclude that the original appointment carries with it the authority actually to try the case which he is designated to try, and the trial may take place either at a regular term or at a special term which he may call for that purpose. If, however, the special judge should find that because of his duties in his own circuit he cannot try the case, he should then resign and let the Governor make a new appointment; but unless the special judge resigns, his authority continues until there has been a trial of the case. This view of the statute will not prevent the Governor from equalizing and facilitating the work in the manner contemplated by the statute, for in making subsequent appointments he will necessarily take into consideration the fact that every special judge once appointed to try the case must continue to act as special judge until one trial has taken place. We therefore conclude that Special Judge Sandidge was authorized by his original appointment to preside at the trial of this case.

It appears that several witnesses were permitted to testify that Thomas O. Phillips was intoxicated on numerous occasions, and was sent to different sanitariums for the purpose of curing him of inebriety, and that about six years before the will was executed, he occupied a room with an unknown woman for a night at Bardstown, and that he and the woman had been drinking and were disorderly on a ball room floor during the same evening. We fail to see upon what theory this evidence was admitted. Where the testator fails to provide for a child, such failure may be explained by proof that the habits and conduct of such child were such as to justify the omission. Conover v. Conover (N. J.), 8 Atlantic, 500; Haight v. Haight, 112 N. Y. Suppl., 144; but where the child is provided for in the will, his acts and conduct, except in so far as they show that he used undue influence or practiced fraud on the testator, are not proper subjects for investigation. The only effect of evidence as to particular immoral acts or conduct on the part of the devisee is to place him in an unenviable position, and to introduce into the case collateral matters which can throw no light upon the real issues in question. If such evidence were admissible, then every devisee under a will would be called upon to defend his character, and the decision of a will case would be made to depend not upon whether fraud or undue influence was practiced, or upon the testamentary capacity of the testator, but upon how far the contestants could succeed in showing that the devisees, because of their immoral acts, were not worthy of being beneficiaries under the will. While it is true that in will contests the evidence is permitted to take a wide range, yet we know of no instance where evidence of the kind referred to has been permitted to go to the jury. Manifestly too the effect of such evidence is to impeach the witness by evidence of particular wrongful acts, which is prohibited by the code. Civil Code, Sec. 597; Lancaster v. Lancaster's Exr., 27 Ky. L. R., 1127, 87 S. W., 1137; Bannon v. Bannon Pipe Co., 136 Ky., 556; Montgomery v. Morton, 143 Ky., 793. We therefore conclude that the court erred to the prejudice of appellant in permitting the evidence complained of to go to the jury.

It is next insisted that there was no evidence of fraud, testamentary incapacity or undue influence, and that the court erred in failing to direct a verdict in favor of the will. These issues we shall discuss separately.

The only circumstances relied on to show fraud are that Mr. McChord requested the testatrix to sign the typewritten will on each page thereof, that the will was not read to the testatrix in the presence of the attesting witnesses, and that the testatrix stated to two or three parties after the execution of the will that she had not discriminated between her children. As typewritten pages may be withdrawn from an instrument and others inserted in lieu thereof, it was altogether proper that the draftsman of the will should have asked Mrs. Phillips to sign each page thereof. Instead of this circumstance being an evidence of fraud, it is evidence of the fact that the will which was probated in the county court is the precise instrument which she signed and acknowledged in the presence of the attesting witnesses, and that no page of the will was withdrawn and another substituted in its place. While it is altogether proper, of course, to read the will to the testatrix in the presence of the attesting witnesses, the custom in this respect does not prevail to such an extent that the failure to do so may be regarded as evidence of fraud. The will in question was executed by Mrs. Phillips when she was 67 years of age. The evidence for contestants leaves no doubt that she was a woman of fine sense and sound judgment. She knew how to read and write. The will was left in her possession. This will, with slight alterations, is the one which she executed in the presence of the attesting witnesses. There is not a single circumstance from which it can be inferred that the will was prepared in one way and another paper substituted for the will. There is no evidence of any trick or device employed by anyone connected with the execution of the will, by which the testatrix was made to sign an instrument which she did not intend to execute. But it is insisted that because she told certain parties that she had not discrimated between the children, we must infer that she did not know that she had discriminated, and that therefore she must have been deceived. It must be remembered that because of the quarrels between the children and their attitude towards her, the position of the testatrix was a very trying one. Her lot was already hard to bear. Had she announced the provisions of her will, doubtless it would have become all the more intolerable. Having other reasons, therefore, why she should not discuss the discrimination made under the will, we conclude that her statements that she had not discriminated between

her children cannot be regarded as evidence of the fact that any fraud was practiced upon her, especially when considered in connection with the fact that she was an intelligent woman and knew how to read, and that she had an opportunity to read the will and did read it. To establish fraud the evidence must amount to something more than mere suspicion. Davis v. Cox, 67 S. W., 261. We therefore conclude that the evidence of fraud was not sufficient to justify the submission of that issue to the jury.

The only evidence of testamentary incapacity is the statement of one witness that Mrs. Phillips did not understand complicated accounts, and the opinions of John Phillips and Bird Phillips, based upon the fact that their mother was a nervous woman and fractious at times, and did not possess the capacity to compute interest, or to make simple calculations, and when asked how much she had gotten from her husband's estate, said that she did not know, and that she did not understand matters of business. Along with this evidence are the statements of a number of witnesses, introduced by contestants themselves, who had known Mrs. Phillips for many years, and had had abundant opportunities to judge of her mental condition, to the effect that she was a woman of fine sense and intelligence. There is not in the entire record the slightest evidence of any irrational act on the part of Mrs. Phillips. It is not shown that she ever said or did a foolish thing; on the contrary, her conduct throughout a long period of time, under the most trying circumstances, was that of a woman of sound sense and good judgment. John B. Phillips admits that his mother always gave the children kindly advice and warned them to do what was right on all occasions. There is no evidence of any disease that impaired testatrix's capacity. The will was made two years before her death. After that time she continued to attend to her household and social duties. Ignorance of mathematics is not evidence of testamentary incapacity. If it were, many of our most strong-minded citizens would be incapacitated to make a will. Contestants did not attempt to prove that Mrs. Phillips forgot that she had this note or that note, or in discussing her affairs, overlooked this particular piece of property or that particular piece of property. They base their contention that she did not know the character and value of her estate on her statement that she did not know

how much she had gotten from her husband's estate, and that she did not know anything about business. Doubtless those who asked the question knew as well as she did how much she had gotten from her husband's estate. She had very good reasons for not discussing the matter with them. The statement claimed to have been made by her was entirely too general and indefinite to be considered evidence of testamentary incapacity. At most it is sufficient only to excite conjecture, and does not rise to the dignity of proof tending to induce conviction. As the facts relied on to show testamentary incapacity are not of themselves evidence of that fact, it follows the opinions based thereon are likewise insufficient for that purpose. Smith v. Commonwealth, 129 Ky., 433; Sanders v. Blakeley, 21 R., 1321; Bush v. Lyle, 89 Ky., 393; Clark v. Young's Extx., 146 Ky., 377.

While it is true that in the judgment of many, contestants were themselves guilty of acts which were sufficient to account for the fact that the testatrix omitted them from her will, yet we conclude that there was sufficient evidence of undue influence to take the case to the jury. There is evidence to the effect that Thos. O. Phillips said that he would see that Bird was disinherited; that he made to his mother false statements of misconduct on the part of Bird. There is further evidence that Mrs. Hundley, in the presence of her mother, accused her sister of acts of impropriety. There was some evidence tending to show that the amount of money John Phillips had gotten from his father was exaggerated, and that Bird Phillips' statement in regard to Mr. Spaulding's fee was true, while the devisees under the will sought to make upon their mother the impression that it was false. There was also evidence to the effect that the cost of the litigation brought by Bird Phillips against her father's estate was greatly exaggerated. There was testimony conducing to show that Tom Phillips took letters from his sister's trunk for the purpose of finding incriminating evidence against her. Here, then, we have a series of circumstances from which the jury, if they believe the evidence for contestants, might conclude that the devisees were engaged in an effort to poison the mind of their mother against the contestants, and these facts, if true, would be some evidence of undue influence.

When it was shown that the devisees made statements to their mother with reference to improper conduct on the part of Bird Phillips, it was competent to

prove that she was not guilty of such conduct, and thus show that the statements were false.

As there was no evidence either of fraud or testamentary incapacity, it follows that the court erred in submitting these issues to the jury. If, upon the next trial the evidence be substantially the same, the court will submit to the jury only the issue of undue influence.

Judgments reversed, and causes remanded for new trial consistent with this opinion.