## Herzog, et al. v. Gipson, et al.

(Decided May 23, 1916.)

### Appeal from McCracken Circuit Court.

1. Deeds—Mental Incapacity—Cancellation.—Upon proper application equity will cancel a deed to real property where it is sufficiently shown that the grantor at the time of executing it was so mentally incompetent as to render him incapable of understanding or protecting his own interests, and a slighter degree of mental infirmity would authorize such relief if the transaction is surrounded by evidence or circumstances of undue influence exercised over the grantor by the grantee.

2. Deeds—Undue Influence.—If one in whom the grantor reposes confidence and to whom he applies for financial assistance at a time when he is in great distress and financial straits and his necessities and distress are used to obtain an undue advantage of him, and an unfair contract is made with him at a greatly inadequate consideration, relief will be given upon proper application against such a bargain.

3. Appeal and Error—Findings of Court.—This court will not disturb the finding of a chancellor as to the facts when the testimony is such as to leave the mind in doubt as to the truth of the matter, and in such cases his finding of fact will be accepted by this court.

W. M. HUSBANDS and D. G. PARK for appellants.

A. M. NICHOLS, JOHN K. HENDRICK and HENDRICK & NICHOLS for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This appeal calls in question the correctness of the judgment of the McCracken circuit court in setting aside and cancelling a deed to a tract of land, composed of

sixty acres, which was executed on the 26th day of January, 1911, by Henry Collier to the appellant, Sophronia E. Herzog. The judgment of cancellation was because, in the opinion of the chancellor, the grantor in the deed at the time he executed it, did not have sufficient mind to make it, and that the appellant, as the grantee therein, took advantage of his physical, mental, and financial condition in procuring or accepting it.

The question is presented in this way: The grantor, Henry Collier, was, at the time of the execution of the deed, about forty years of age and had no wife or children, although he had once been married, but had been a widower for about fifteen years. His parents were each dead, and he had been suffering for something like six or seven years with tuberculosis of the bowels, called by one of the physician witnesses, "inflammation of the gastro intestinal tract." This disease first appeared about 1905 and continued to grow worse until his death on March 30, 1911. He left surviving him, as his only heirs at law, a sister of the whole blood, appellee, Daisy Gipson (nee Collier), and a half sister, appellant, Sophronia Herzog, and the other appellants, being the children of a deceased half brother. By the beginning of 1911, his health had become so impaired as to render it manifest to his relatives, friends and acquaintances, that he had but a brief time to live. He seems to have stayed at the homes of those who would permit him and a part of the time with a cousin, a Mr. Francis; but about two or three weeks before the execution of the deed in question he went to a hospital in the city of Paducah where he remained until a short while before his death. This suit was filed by the appellee, Mrs. Gipson, against the appellants, wherein she sought the sale of a tract of 78 acres of land in McCracken county, including the 60 acres covered by the deed to appellant, which she claimed was owned jointly by the parties as the heirs of the deceased, Henry Collier. The sale was asked for purpose of division among the heirs, the petition making the necessary allegations to obtain that relief. The appellant, Sophronia Herzog, in her answer denied that the deceased owned any of the land described in the petition at his death, because, as she alleged, of the conveyance of the 60 acres to her, which we have mentioned, and that the only title which he had to the remaining 18 acres was through the will of their mother, Mrs.

Martha Collier, which will, as she alleged, devised to the deceased only a life interest in the 18 acres. It was, therefore, denied that the appellee had any interest at all in any of the land. sought to be sold. The reply denied that the deceased obtained only a title for life in the 18 acres, under the will of his mother, and further alleged that the deed which he had executed to appellant on January 26, 1911, was void because of his mental incapacity to .execute it . and undue influence exercised over him by appellant. These allegations were denied, and upon trial, the judgment before referred to was rendered, but it was also determined that the deceased had only a life interest in the 18 acres referred to. The judgment ordered a sale of the 60 acres covered by the deed to appellant, and that out of the proceeds she be paid $150.00, the amount she agreed to pay for the land, together with interest, and that the balance, after the payment of costs, be divided between the parties according to their legal rights. In the judgment, appellee prayed and was granted an appeal from that part of it holding that the deceased had only a life interest in the 18 acres under his mother's will, and declining to order any of it sold, but this appeal has not been followed up, and the only question which we are called upon to determine is that raised by the appeal from that part of the judgment cancelling the deed.

It has long been an unvarying rule of equity, where the facts justified it, to grant this character of relief. In the very nature of things, there can not be a hard and fast rule laid down which should apply to all cases, because the facts in each case are scarcely ever identical. So that, to this extent, each case must be governed by its own facts. The general rule that if one of the contracting parties does not have mind sufficient to comprehend the nature of the transaction, or to guard and protect his rights, the courts will interfere in his behalf, is everywhere understood. The rule that if an undue advantage is taken of one's situation and circumstances, by and through which an unfair and unconscionable contract is obtained from him, equity, upon proper application, will afford relief, is likewise well understood. These rules are stated by the courts and text-writers in different language, but uniformly having the same meaning. The rule as to mental capacity

was stated by this court in the case of Lassiter's Admr., etc. v. Lassiter's Exor., etc., 23 Ky. Law Rep. 481, thus:

"To authorize such a decree (setting aside the deed) in the absence of undue influence, it must be shown that decedent (grantor), was laboring under such a degree of mental infirmity as rendered him incapable of understanding, or protecting his own interest." See also Story's Equity Jurisprudence, section 235.

However, a slighter degree of mental infirmity coupled with undue influence, or the taking advantage of one's necessities, will authorize and justify a decree of cancellation. This general rule is well stated in volume 9 Cyc. 461, where it is said:

"Where one party has taken advantage of another's necessities and distress to obtain an unfair advantage over him, and the latter owing to his condition has encumbered himself with a heavy liability or an onerous obligation for the sake of a small or inadequate present gain, equity will relieve him. Whenever, it is laid down by a leading authority, a person is in pecuniary necessity or distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such a condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration, and the like, even though there be no actual distress or threats, equity may relieve defensively or affirmatively."

To the same effect is Pomroy on Equity Jurisprudence, section 948. This court in the early case of Esham and wife v. Lamar, 10 B. Mon. 43, recognized and applied the doctrine of the text to the facts of that case. The facts there were: That appellants were very destitute and their necessities great. They had obtained from the appellee $25.00, and had delivered to him the possession of a female slave, worth, according to the proof, $350.00 or $400.00. The appellee at the time executed a writing to appellant in which it was recited that he had purchased the slave for that sum, and the proof tended to show that he was correct in his contentions, but the court in giving to appellants the right to cancel and rescind the contract, said:

"The facts stated in the opinion and proved by the record, manifest, conclusively, that the contract, on the part of Lamar, was hard, unconscientious, and extorsive, and such as the peculiarly unfortunate circumstances of his old Maryland neighbors, should have for-

bidden him to make. It is a contract which ought not to be enforced, but on the contrary, is of that character which the chancellor, delighting to do equity and resist oppression, ought to rescind.''

It makes no difference as to the rule in this respect, composing as it does a part of the general doctrine underlying equity jurisprudence, that in that particular case the transaction had some of the features of a pledge, for it was not because of this that the court set aside and cancelled the transaction, but because it was one, as therein stated, ''which ought not to be enforced,'' for it ''was hard, unconscientious and extorsive.'' The rule by which the chancellor is to be guided in such cases, and as herein stated, has been adopted and has been applied by this court in an unbroken line of decisions, some of which are: Smith v. Snoden, 96 Ky. 32; McElwain v. Russell, 11 Ky. Law Rep. 649; Talbott v. Bedford, 21 Ky. Law Rep. 897; Bradley v. Bradley, 28 Ky. Law Rep. 1261; Kager v. Kager, 29 Ky. Law Rep. 235; Hoeb v. Maschinot, 140 Ky. 330; Hall v. Orme, 146 Ky. 467; McDowell v. Edwards, 156 Ky. 479; Miller v. Taylor, 165 Ky. 463.

In the Bradley case, *supra,* which was a transaction between father and son, and where the necessities of the grantor were not so great as in the case now under consideration, nor was the confidential relations existing between the parties any more pronounced, this court said:

''The conduct of appellee in buying this land from his father at little more than one-half its value at the time and under the circumstances shown in this record, especially in view of the fact that it was all the property his father owned, is not to be commended. It may be true that appellant's mind was not impaired to such an extent as to render him irresponsible for his acts or release him from the obligation of fair contracts, nor is this necessary in cases of this character.''

As further illustrating the rules of practice covering this character of cases, as well as the equity rule under consideration, this court in the case of Miller v. Taylor, *supra,* quoted with approval from McDowell v. Edwards, as follows:

''The law looks with suspicion upon the transfers of property by persons mentally or physically infirm to those having custody of them. Even when parties in

good health stand in a confidential relation to each other, the burden is upon the stronger character who procures an advantage, to show that a transaction was fair; and relief will be afforded in equity in all such transactions in which influence has been acquired and abused, in which confidence has been reposed and betrayed. Allore v. Jewell, 94 U. S. 512. The relief stands upon the general principle applying to all the varieties of relations in which dominion may be exercised by one person over another. Smith v. Kay, 7 H. L. Cas. 750; Tate v. Williamson, L. R. 2 Ch. 61.''

Having ascertained the rule of law applicable in such cases, it is necessary to look briefly to the facts surrounding the transaction called in question, a part of which we have already stated. The appellee, together with her witnesses, T. J. McNeil, Phillip Poat, R. H. Jeffrey, Dr. R. D. Harper, Hon. Alben W. Barkley, and J. W. Francis, each and all testify, not only as to the long physical affliction of the grantor, as we have herein shown, but that he, about the time of the execution of the deed and before and following it did not have mind enough or understanding sufficient, according to their opinion, to make a contract or to execute a deed. As is usual in such cases, some of the witnesses could not state any specific fact more than their long acquaintance with him and an observance of a mental decay. Dr. Harper and some of the other witnesses who had known him practically all of his life, say that, ''he was droll mentally and physically too.'' The doctor further says: ''He had a mind that I would say was not up to the normal of persons of his environment. He could not receive an education.'' He says in other parts of his testimony that this mental deficiency was natural with the deceased and that his affliction impaired this deficient intellect. Hon. Alben W. Barkley, who was at that time county judge of McCracken county, but at the time he testified, Congressman from the first district in Kentucky, testified: ''So far as his mental condition is concerned—of course I am not an expert on the mind, but he was weak mentally, and I dont think from my experiences with him that he was able to transact his own business. He was in such mental state that he could not be trusted to do anything.'' As against this testimony, we have that of appellant, and that of her son, George Herzog, and Mrs. Koerner, and husband, the

former being the daughter of appellant; Mr. Gus Singleton, the county court clerk, Dr. Duley, Dr. Hessig, and Dr. Bass. The substance of the testimony of these witnesses, is: That the times which they saw the deceased preceding the execution of the deed, they discovered nothing about him to indicate any weakness of mind. A number of these witnesses were in his presence but a few times and for a very brief period. Mr. Singleton, although knowing him all of his life, had but few words with him at the time the deed was acknowledged. The deceased was confined to his bed in the hospital at that time and all that transpired, according to the witnesses, was this: "Q. Did you have any conversation with Mr. Collier at that time? A. Yes, sir, I said, Homdy Henry, how are you today? I came here to take your acknowledgment to this deed to your sister, and want you to sign it and acknowledge it, and he said, 'all righ?' Q. And that was all that took place? A. Yes, sir, I read the deed to him in full."

Under such circumstances and with such limited opportunity as this, Mr. Singleton no doubt saw nothing to indicate otherwise than as he testified, all of which is not inconsistent with the grantor's general mental condition as testified to by appellee and her witnesses. The other witnesses for appellant, including the physicians, made no test or observations of the deceased for the purpose of ascertaining his mental condition, but they testified as to their judgment from casual and brief conversations with him.

There are circumstances in this case which are entitled to be weighed in determining the question presented. One is, that the agreed consideration stated in the deed is $150.00, only $20.00 of which was paid, and the balance to be paid in monthly payments of $20.00, except the last note which was for only $10.00. The land was assessed at $650.00 in the year 1910. There was a house with three rooms, a barn, and stables upon it. The testimony for the appellee, is, according to the varying estimates of witnesses, that the land at the time was worth from $1,200.00 to $2,000.00. The only witness for appellant upon the question of value, excluding the assessor, is her son, George Herzog, and he testified that the land was worth about $600.00; and that the money consideration paid and agreed to be paid, together with the rentals from a five-year lease which had

been made of the place by the deceased, and which it is claimed he was to have, would make the consideration as much as the land was worth. It must not be forgotten, however, that there is nothing said in the deed about the decedent retaining the proceeds from this lease, and the only testimony upon this point is that given by the appellant. Her testimony on this subject being:

"Q. State whether or not you bought it subject to that lease? A. I knew the lease was on it. He was in bad health and couldn't get any money, and he said, 'Sophronia if you will give me $150.00 it will do me good at the present time as I am out of medicine, and if you will let me have it I will deed you the place.' I got him up the money and was to let him have it as long as he needed it—and I paid him as he needed it, $10.00, $20.00, and until he drew it all out but $90.00, and then of course after he died he didn't need it."

Asked as to the condition of his mind, she says: "I think his mind was all right. He knew who his friends were and he knew who to call on for help; if he didn't, why didn't he go to somebody else?" And being asked as to who suggested the making of the deed, she said: "Why, he did. He said that he was in such a shape that he didn't have no money, and was *bound to have some,* some way." This shows that she knew of his imperative necessities.

The deed was written by Judge Barkley in the absence of the deceased and at the solicitation and request of the husband of appellant.

It further appears that on the 23rd day of March, 1911, just seven days preceding the grantor's death, he executed a will by which he devised all of his property of every character and description to the appellant, Mrs. Sophronia Herzog, and appointed her executrix thereof, and requested the court therein to permit her to qualify without executing bond or being required to make any inventory of his estate. The probating of this will was contested on the ground of mental incapacity of the testator, and undue influence exercised over him, which resulted in a verdict and judgment setting the will aside, all of which occurred on the 23rd day of November, 1912; but the deed assailed by this proceeding was not recorded in the county court of McCracken county until the 22nd day of September, 1913, or nearly two and a half years after it was executed. There

is nothing in the record to show any motive for these continued efforts by the deceased to prefer the appellant over his other relatives. She neither lived or had lived in the immediate neighborhood of his home for many years, nor did he visit her house as much as he did that of the appellee, who was his full sister while appellant was his half sister. It is true that upon the death of the father of appellee and the deceased, there was a difference of opinion between them as to what should be done with the land owned by the father and inherited by the two, but this did not develop according to the proof, into any bitterness, nor did it produce anything like a lasting breach between the brother and sister.

It is furthermore shown, that a short while before the death of Collier, and after he left the hospital, he had a conversation with the witness Barkley to this effect:

"I said, Henry, if I had known you were going to give that land or that farm of yours away out there, I'd applied for it myself, and he says: 'What do you mean,' I said, 'I mean what I say, if you signed that deed I wrote for Mr. Herzog you have deeded your place away for $150.00, and he said, 'No, I didn't sign any deed, Mrs. Herzog loaned me $150.00 and I signed a mortgage on my place for $150.00,' and then I said, 'The paper I drew up was a deed and if you have signed that paper you have deeded your place away,' and he replied by saying that they told him it was a mortgage."

Appellant did not introduce herself or any one in rebuttal to deny this, or explain the absence of grounds for this false, if false, impression of her half brother, relying exclusively on her testimony in chief upon this point.

We will not comment upon the circumstances appearing in the record and which we have just stated, further than to say that they show, at least to some extent, that, in the absence of any circumstance as to why the deceased should exercise a preference toward appellant, we must conclude that it was the result of the influence of some person, which person, it might be surmised, was the one who upon every occasion was to be the beneficiary. Furthermore, it is the rule in this character of cases to give due weight to the finding of the chancellor upon a question of fact, which rule is well stated in the case of Miller v. Taylor, *supra,* as follows:

"The proof of undue influence in this case is slight, but, under the law which looks with suspicion upon death-bed transfers, it is sufficient to support the finding of the chancellor. He knew the witnesses, and the burden was upon the appellant to show the fairness of the transaction; and, under that salutary rule which requires this court not to disturb the finding of the chancellor where the evidence is conflicting, and the court is not convinced that the chancellor has erred to the prejudice of the substantial rights of the appellant, or has merely a doubt as to the correctness of his judgment, an affirmance must follow. Byassee v. Evans, 143 Ky. 415; Wathen v. Wathen, 149 Ky. 505; Bond v. Bond, 150 Ky. 392; Salmon v. Martin, 156 Ky. 309; McDowell v. Edwards' Admr., 156 Ky. 475."

The appellant was placed by the judgment, in *statu quo* under the facts disclosed by the record, which is all to which she, in equity, is entitled.

Judgment affirmed.