## Conservative Life Insurance Company v. Hutchinson.

(Decided June 7, 1932.)

WAUGH & HOWERTON for appellant.

ADAMSON & SPARKS, H. O. WILLIAMS and ARMOND R. IMES for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The appellant, Conservative Life Insurance Company, defended this suit on two policies issued on the life of John L. Hutchinson, upon the grounds that he had made false and material answers to certain questions in his application and medical examination, and that the

policies had been surrendered and canceled by agreement. There was a verdict for the plaintiff in the sum of $4,000, the amount of the policies, and this appeal follows.

The question asked in the application, the answer to which is claimed to be false, was: "Are you engaged now, or have you any intention of engaging directly or indirectly in the manufacture, sale or handling of malt or spirituous liquors? (Give full particulars)." This was answered: "No." In the medical examination the question was asked: "Have you ever used alcoholic drinks to excess or intoxication?" The answer was: "No." Another question was: "Are you in good health, free from all disease, complaint or injury?" The answer was: "Yes."

It is to be observed that the first question called for information as to whether the applicant was at the time he made the answers engaged in the handling of liquors and as to his present intention with respect thereto. It cannot be construed as a representation or promissory warranty that he would not in the future engage in that business. The second question called for information as to his use of intoxicants to excess in the past. The evidence consisted in the main of testimony that the insured's general reputation in the neighborhood in regard to using, handling, and manufacturing intoxicating liquor was bad. A witness stated that in the spring of 1928, six months after the policy was issued, he had sold Hutchinson two hundred pounds of sugar, and he then talked as if he had been buying it in quantities at other places. He was not drunk, but had the odor of whisky on his breath. In the fall of the year 1927, the witness had waited on the roadside while another man went into Hutchinson's house and came out with whisky. Cross-examination elicited a statement that two neighbors had said Hutchinson was a drunkard and had killed himself drinking whisky. The materiality of the answers in the application and medical examination was proved. There was no evidence introduced by the plaintiff to refute the evidence outlined, but two intimate friends of many years, on cross-examination, stated they had never seen him take a drink, and another that Hutchinson's face was not flushed as to indicate heavy drinking. Dr. Holbrook, the medical examiner, testified no symptom of an excessive use of liquor was disclosed in the examina-

tion, which was of a nature to have revealed such if there had been any in the subject.

Is the evidence sufficient to authorize a directed verdict that the answers made were false? We think not. Compare Columbia Life Insurance Company v. Tousey, 152 Ky. 447, 153 S. W. 767; Ætna Life Insurance Company v. McCullagh, 185 Ky. 665, 215 S. W. 821. In prosecutions under the criminal law, the statute authorizes testimony to be heard as to the general reputation of the defendant in respect to engaging in the business of handling illicit liquors; and it is to be treated as substantive evidence; but such proof alone is not sufficient to convict. Section 2554a-15, Statutes; Lakes v. Commonwealth, 200 Ky. 266, 254 S. W. 908. It is not necessary to say that in a civil suit the charge that one was at a given time engaged in that business and entertained an intention to do so in the future could be thus proved (see 14 R. C. L. 1079), for the issue was submitted and the jury found the evidence not sufficient to sustain the allegations.

Appellant confesses that the only proof it was able to adduce that Hutchinson was not in good health when he signed the application is that he had previously weighed fifteen to twenty-five pounds more than he did at the time, and the inference to be drawn from the fact that within less than a year he had died of heart trouble. This issue, too, was submitted to the jury.

It was admitted that about three months before the insured's death he had surrendered the policies sued on, accepted a return of the premiums, and executed a release from liability. The beneficiary sought to avoid this transaction upon the grounds that the insured was mentally incompetent to agree to a cancellation of the policies and that their surrender had been obtained through undue influence. The verdict sustained the pleas. The argument that the company was entitled to a peremptory instruction or a new trial because the verdict is not sustained by the evidence requires its review.

It appears that the insurance company was not satisfied with some of the risks it had assumed through the local agent who had written the Hutchinson policies and desired to cancel them. On the morning of April 25, 1928, eight months after the policies were issued, Berry, a special agent, accompanied by Renfroe, a local agent, called upon Hutchinson at his home in the country. Berry stated their purpose was to obtain a surrender of

the policies because some facts had not been disclosed in his application, and that the company would not have issued the policies had they known the facts. He offered to return his premiums and cancel the policies. After discussing the matter, Hutchinson agreed to surrender them, but, when Berry told him he did not have enough cash and would give him his personal check for a part of the return premiums, he stated that he preferred all cash. So the agents went back to Ashland to get the money. That afternoon as they started to Hutchinson's home they saw Gillum, his neighbor, on the street, and offered to take him to his home. Gillum went with the other two to call on Hutchinson, who told them that he had been thinking it over and wanted to consult a lawyer before he gave up the insurance. Berry told him that would be all right and asked where he might see him again. He and Renfroe went out on the porch, and neighbor Gillum told Hutchinson that the company wanted to cancel the policies because he was a sick man when they were issued, and, as he understood it, the company would contest them and could have them canceled. Thereupon Hutchinson concluded that he would surrender them rather than have, as he said, any trouble. The other men were then called in, and Hutchinson asked his wife to get the policies, which she did, and they were delivered to Berry, who paid Hutchinson $100.76, the amount of the premiums, for which he gave a receipt and release from liability. It was not disclosed to him that his friend and neighbor, Gillum, was also an agent of the company. After the matter was closed, Hutchinson showed them over his place, and they parted with him satisfied. He died of heart trouble three months later.

On the issue of mental incompetency, other than mere expressions of opinion by neighbors that Hutchinson was not mentally competent to transact any business of importance at and about the time of the surrender of his insurance, there is evidence that he had been sick during the previous winter, and that he would wander in conversation; appeared "flighty"; and had quit attending to any sort of business. Without objection, a witness was permitted to testify that Hutchinson's wife had sent for him several times to come to the home, as she could do nothing with him, and was afraid he would go crazy and kill his family. The county judge, who tried a condemnation suit defended by Hutchinson about three weeks after the policies were surrendered, testified

that when he came in Hutchinson did not know him and had to be told who he was, although they had known one another for twenty-five years, formerly quite intimately. The judge testified that during that trial Hutchinson was "flighty" and would get "wild." The county clerk testified that his color was that of a sick man, and that in giving his testimony he was nervous and did not seem to be conscious of what was going on. His attorney in that case stated he was sick, and did not appear to be mentally alert as formerly.

Dr. Davis visited Hutchinson professionally several times from May until his death in July, and testified that he was affected with pyorrhea, bronchial trouble, stomach disorders, and had a valvular heart, which caused a smothering condition, and interfered with his sleep so much as to require morphine. While he had not studied his mental condition, he noticed that the patient talked irrationally. The doctor did not consider that he was competent to transact any business on the occasion he had seen him. Dr. De Bord examined Hutchinson about the last of March or the first of April, and found him with a severe heart lesion and breathing with difficulty. He afterwards visited other patients living in the same house with Hutchinson. He expressed the opinion that, taking his condition as a whole, Hutchinson was not mentally capable of entering into a contract; although upon a hypothetical question reciting certain activities submitted by the defendant, the doctor stated he may have been competent at intervals. Although Hutchinson had signed his name to the applications for insurance, and was regarded as a good scribe in his community, he had signed the receipt and release by mark.

Over against this is the evidence of the representatives of the company already briefly stated. It may be added that, when they arrived, Hutchinson was lying across the bed, but got up and said he was suffering with a cold and was feeling bad. Renfroe stated he said he had the "flu" for three weeks and appeared to be "pretty sick" and "pretty bad off." These men and several neighbors stated they had observed nothing wrong with his mind, and it was shown he had been able to advise his counsel and participate in the condemnation suit three weeks after he had agreed to surrender the policies.

To rescind a contract by mutual consent, there must be a meeting of the minds of the parties to it the same

as in the making of the contract. Mattingly-Lusky Realty Company v. Camper, 228 Ky. 407, 15 S. W. (2d) 240; Black on Recission and Cancellation of Contracts, sec. 526; 13 C. J. 601. Like other contracts, a policy of insurance may be canceled, rescinded, or terminated at any time by mutual agreement and consent of the parties to it. Black, secs. 475, 476, 480; Crice v. Illinois Life Insurance Company, 122 Ky. 572, 92 S. W. 560, 121 Am. St. Rep. 489, 29 Ky. Law Rep. 91. But the validity of the cancellation may be impeached for misrepresentation, fraud, or mental incapacity. Id., sec. 493. The capacity to agree in such an instance is the same as that required for the execution of the contract in the first place. The test of the mental capacity necessary to sustain the cancellation is whether the person possesses sufficient mind to understand in a reasonable way the nature and effect of the act in which he is engaged; and, in order to avoid it, it must be shown that the mind of the party was of such a character that he had no reasonable perception or understanding of its nature and could not appreciate the probable consequences upon his rights and interests, 32 C. J. 727; Black on Rescission and Cancellation, sec. 262; Herzog v. Gipson, 170 Ky. 325, 185 S. W. 1119; Bevins v. Lowe, 159 Ky. 439, 167 S. W. 422; Bannon v. Patrick Bannon Sewer Pipe Company, 136 Ky. 556, 119 S. W. 1170; 124 S. W. 843; Jones v. Stamps, 194 Ky. 377, 238 S. W. 762; Stair v. Gilbert, 209 Ky. 243, 272 S. W. 732. The courts recognize that a higher degree of mentality is required in the making of a trade or mutual contract than in a testamentary disposition of property or similar transactions; also that the weaker the mentality the less evidence of the exercise of undue influence is required. Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102.

These issues were properly submitted to the jury under instructions defining unsoundness of mind in accordance with the standard stated and undue influence as often given. Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13. Considering the evidence outlined and the persuasive inferences arising from the fact that a man suffering with heart disease, and conscious of his physical infirmities, surrendered his insurance for only a return of premiums, without interest thereon, we regard the verdict as sustained by the evidence.

Finally, it is said the court erred in not transferring the case to equity, since it involved the rescission and

cancellation of a contract. Counsel has confused suits seeking to have an instrument annulled by the equity courts and an issue raised in a common-law action as to the capacity of one to make a contract. Whether a person whose contract is sought to be avoided was non compos mentis at the date of the particular contract or transaction is a legal issue, and properly triable by a jury. Small v. Reeves, 104 Ky. 289, 46 S. W. 726, 20 Ky. Law Rep. 504; L. & N. Railroad Company v. Carter, 66 S. W. 508, 23 Ky. Law Rep. 2017.

The plaintiff testified that, when the insurance agents came, her husband was in bed and got up to see them. While incompetent, as claimed, the evidence was not prejudicial, particularly so as one of the visitors testified to the same thing.

The judgment is affirmed.