# Jefferson Standard Life Insurance Company v. Cheek's Administrator.

622

BRUCE & BULLITT and CHAS. J. WHITE for appellant.

VICTOR L. KELLEY and R. F. PEAK for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Affirming.

On April 1, 1920, the Jefferson Standard Life Insurance Company issued a $5,000 policy on the life of Warren Cheek. The annual premiums on this policy were paid up to April 1, 1930, and under the terms of the policy the insured had a thirty-day period of grace in which to pay the premium due on that date.

On April 25, 1930, the insured committed suicide, and thereafter his administrator, with the will annexed,

instituted an action seeking to recover the principal sum of the policy less a policy loan of $1,115 and a note given in payment of a premium in the sum of $285.63. At the instance of defendant, the action was removed to the federal court where a motion to dismiss without prejudice was sustained, and plaintiff then filed this action in the Spencer circuit court reducing his claim and demand, after satisfying insured's indebtedness against the policy to the sum of $3,000.

By answer the company alleged that on or about April 1, 1927, insured applied and was granted a policy loan of $1,115, evidenced by a note of that date which was executed and delivered to the company, and that on or about March 1, 1930, he also executed and delivered to the company a lien note of $285.63 in payment of a premium due on the policy; that at the end of the tenth year (April 1, 1930) the policy had a cash surrender value of $1,495, and on April 14, 1930, insured applied to the company for the full cash surrender value thereof less the amount of the indebtedness which he owed thereon; that he surrendered the policy and executed and delivered to the company a written release whereby, in consideration of the full cash surrender value of the policy, he released and discharged the company from all liability arising out of or under the policy, and the company canceled and delivered to insured the two notes and a check of $192.12 representing the balance on the cash surrender value after deducting the indebtedness; that insured accepted this in full settlement of the balance due him on the policy. It was further alleged that the check had not been presented to the bank on which it was drawn for payment and defendant offered to confess judgment in favor of plaintiff for the amount of the check with interest.

By reply, plaintiff pleaded that at the time of the surrender of the policy and the delivery of the release as set forth in the answer, insured was insane and wholly incapacitated to make a valid surrender of the policy or to execute or deliver the release and was so insane, incompetent, and incapable of doing or performing a valid act that he did not know the nature or effect of the surrender of the policy or of the effect of the release.

By rejoinder the company traversed the allegations of the reply, and trial before a jury on the issues thus

made resulted in a verdict and judgment for plaintiff in the amount sued for and defendant is appealing.

The grounds relied on for reversal call for a summary of the evidence. Neighbors and acquaintances of insured who had known him for a number of years testified that up to and until about one year before his death he was a good business man and a successful farmer and trader; that he talked intelligently and at length concerning his business activities and upon other matters; that he read a great deal and was well informed, but that about a year before his death they noted a change in him; that he became morose, non-communicative, and sought to avoid the companionship of his former friends and associates; that he seemed to be highly nervous and disturbed and would talk incoherently and his mind appeared to wander as was evidenced by jumping from subject to subject in his conversation. Before this change in his condition, he seemed to lay stress on his life insurance and the fact that it would pay his indebtedness and preserve his estate for his wife and children, but afterwards his ideas in this respect seemed somewhat changed. One witness who worked for him in his home during the last year of his life testified that Mr. Cheek talked with him about his wife, charging her with infidelity, and stated that she was having improper relations with two men; that he indicated that he had no desire to leave insurance by which these improper associates might profit. This witness testified that on the first or second Sunday in April, 1930, when other members of the family had gone to church, Mr. Cheek went to bed and later the witness went to the room, found he had gone, but left his clothes. He then went to the barn and found that Mr. Cheek, who was in his nightclothes, had bridled and mounted a horse, saying that it was time to milk and he was going for the cows. This was about 10 o'clock in the morning and the milking had been done. A number of other incidents were related by witnesses indicating that insured's mind was unbalanced.

Mr. Cheek was indebted to a bank at Taylorsville and the bankers were insisting that he secure this indebtedness in some way. The banker testified that when he called at the bank to talk about the matter he seemed to be highly nervous and agitated and the last few times he talked about the matter he would go all to pieces

and cry; that he mentioned his life insurance and said it would pay his debts leaving his estate clear to his wife and children. He stated that from his observations of the conduct of Mr. Cheek and the latter's conversation he hardly believed that on April 4, 1930, he had mind enough to know the nature and effect of the act of signing a paper canceling his life insurance. On cross-examination he stated that insured seemed to understand that he owed the bank and that he was being asked to secure the indebtedness, but stated that when asked a question he would make a statement and in a minute or so after would say something exactly to the opposite. The witness further stated that insured seemed to be competent to make a mortgage and he was willing to take a mortgage from him, but stated that it was his understanding that so long as one had not been declared incompetent, he was competent in the eyes of the law and a mortgage made by him would be valid.

It seems that Mr. Cheek's actions and conduct were such that members of his family and the farm hands kept pretty close watch over him. On the morning of April 25, 1930, Mr. Cheek's manner and conversation seemed to arouse the attention and suspicion of Mrs. Cheek and the farm hand. He asked John Waldridge to go back on the place to look after some cattle and when he returned Mr. Cheek had disappeared and Mrs. Cheek requested that he make a search for him. He found him dead in the creek with a gun shot wound through his head and a pistol lying near him. He had removed his hat, coat, and shoes and had apparently waded into the creek where he shot himself. The pistol belonged to the witness Waldridge who testified that he kept it in a bureau drawer in a room on the second floor; that Mr. Cheek had evidently procured the pistol while he was going to look after the cattle.

Two physicians who were asked hypothetical questions based on facts and circumstances detailed by wit nesses gave as their opinion that on April 14, 1930, insured did not have mind sufficient to know the nature and effect of his act in signing the cancellation of his insurance policy. One witness testified that he had heard a relative of Mr. Cheek's offer to lend sufficient money to pay the premium due on his policy April 1, 1930. A number of witnesses were asked, and over the

objections of appellant permitted to testify as to the good reputation of Mrs. Cheek for virtue and morality.

Miss Mary Webb, cashier in appellant's office in Louisville, testified concerning the effect of the release and cancellation of the policy and the transactions and correspondence leading up to it. She testified in substance and effect that Mr. Cheek appeared to be perfectly rational and to fully understand the entire transaction. Ray Averitt, who accompanied Mr. Cheek to Louisville on April 14, 1930, testified that he noticed nothing unusual on the part of Mr. Cheek; that the latter talked while going and coming, but said nothing about the insurance transaction.

As the first ground urged for reversal, it is argued that the court should have directed a verdict for appellant because there is not a scintilla of evidence that at the time insured surrendered the policy he did not understand in a reasonable way the nature and effect of his acts in so doing. On this question we find both parties relying on the case of Conservative Life Insurance Co. v. Hutchinson, 244 Ky. 746, 52 S. W. (2d) 709, 711. Respecting the mental capacity necessary to sustain a contract canceling an insurance policy, the opinion in that case says:

"The test of the mental capacity necessary to sustain the cancellation is whether the person possesses sufficient mind to understand in a reasonable way the nature and effect of the act in which he is engaged; and, in order to avoid it, it must be shown that the mind of the party was of such a character that he had no reasonable perception or understanding of its nature and could not appreciate the probable consequences upon his rights and interests."

It was also held that under the evidence the court properly submitted the issues upon this question to the jury. Without entering into a detailed discussion of the evidence in that case, it is sufficient to say that a review of it will readily disclose that the evidence of insanity of insured was no greater, if in fact it was as persuasive, as it was in this case. Counsel, however, insist that to affect the validity of insured's contract on April 14, the evidence of his insanity should relate to that immediate time and that it was not sufficient to

show previous or subsequent insanity. The authorities are in agreement on that proposition, however, evidence of such previous or subsequent insanity is competent and may be considered as bearing on the insanity of the party on the date the contract was made. Here, there is evidence of acts and conduct of insured about a year previous to his death tending to indicate imbalance of mind. This, according to the evidence, was progressive, and became much more marked and noticeable in the later days of insured's life. The opinion of neighbors, acquaintances, and associates, based upon their observation of acts and conduct of Mr. Cheek, was that he did not have sufficient mind on April 14, 1930, to understand and appreciate the nature and effect of his contract. Physicians' opinions based on a recital of these facts were to the same effect. It is therefore apparent that it was proper to submit this issue to the jury.

It is next argued that the court erred in admitting evidence concerning Mrs. Cheek's reputation for virtue and morality. Obviously, the purpose of this evidence was to show that Mr. Cheek's jealousies and suspicions of his wife were not founded on fact, but were insane delusions, and, in the circumstances, it was unquestionably competent.

As a third ground, it is urged that appellant's objection to the hypothetical questions propounded to the physicians should have been sustained and that their answers did not constitute a scintilla of substantive evidence. The competency of the hypothetical question is attacked on the ground that it did not state the facts as (1) it contained a statement that the value of the policy was $92.16 without any reference to the debt which was settled by its surrender; (2) that it contained a statement that Mr. Cheek never saw the check for the net cash surrender value when there was no evidence that this was true; (3) that it contained a statement that Mrs. Cheek was a domestic woman and did not leave home often, while one witness testified that she was a woman who went quite often; and (4) because it contained a statement that a relative offered to lend money to Mr. Cheek to pay the premium and that this was hearsay.

The jury heard all the evidence concerning these matters, and it is apparent that they could not have

been misled by these statements. It is equally apparent that, if the statements complained of were not based on facts in evidence, there was nothing whatsoever in them calculated to mislead or in any way affect the opinion of the physicians. In their assertion that the doctor's anwers to the hypothetical questions do not constitute a scintilla of evidence of substantive value, counsel cite and rely on the case of Dossenbach et al. v. Reidhar's Ex'x et al., 245 Ky. 449, 53 S. W. (2d) 731. In that case it was held that the opinion of witnesses concerning the testamentary capacity of a person is competent evidence in will cases, but that such opinions are insufficient to take the case to the jury unless the facts upon which they are based tend to establish lack of testamentary capacity. It was further held that when an expert opinion is rested upon simple facts of life and everyday occurrences, it is of no greater weight or value than that of any other intelligent person. If the evidence of laymen concerning the acts and conduct of deceased and the manner in which his death occurred was competent, then certainly the opinions of doctors based on these facts were competent and were evidence of probative value.

It is further argued that the evidence of the administrator that he heard a relative of Mr. Cheek's offer to lend him money to pay the premium should have been excluded on the ground that it was hearsay and not the best of evidence. It is a theory of counsel that the kinsman who it is claimed made the offer is the best witness concerning that matter. There would be merit in this contention if the witness had testified to statements made to him by the kinsman, but such is not the case. The witness testified that he heard the offer made directly to the insured, and it is competent to show that the latter was afforded an opportunity and means of securing funds to pay the premium.

Finally, it is urged that the court erred in refusing to give instruction E offered by appellant which reads:

"The plaintiff cannot recover in this action by showing that Warren Cheek on dates other than the date upon which he delivered the release and policy sued upon herein to the agent of the defendant, was so insane as not to realize the consequences of his acts but the plaintiff must show that

he was so insane at the particular time when Warren Cheek signed the release and delivered the policy to the agent of defendant."

Counsel are quite right in their contention and are sustained by practically an unanimity of authority that unsoundness of mind to avoid a contract must relate to the immediate time when the contract was made. Under the instructions given by the court, the jury could not find for appellee unless they believed that at the very time insured signed the cancellation agreement or contract on April 14, 1930, he did not have mental capacity sufficient to understand its nature and effect, and were further instructed that the law presumes every person to be of sound mind until the contrary is shown by evidence, and if insured was of sound mind at the time he executed the cancellation agreement, he had mental capacity to enable him to know the contents of the paper and the character and effect of his action. The instructions given fairly and properly submitted the issues made by pleading and proof.

Judgment affirmed.