Pfuelb et al. v. Pfuelb et al.

(Decided Nov. 25, 1938.)

TILFORD & WETHERBY for appellants.

JOSEPH W. CAMBRON and WOODWARD, DAWSON & HOBSON for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

Joseph Pfuelb died June 21, 1936, leaving a will dated May 5, 1936. He was twice married, his first wife having died in 1932, leaving ten living children. In 1935 he married Wilhelmina Sieber, but no children were born to the latter marriage. By the terms of his will he bequeathed to the St. Joseph's Orphans Home of Louisville, Kentucky, the sum of $100 and to St. Peter's Catholic Church the sum of $50. By Item 4 of the will he bequeathed all the rest of his personal property to his wife, Wilhelmina Sieber Pfuelb, in fee simple; and by Item 5 he devised to his wife all of his real estate for life with remainder to nine of his ten children by his first wife, expressly excluding or omitting his eldest son, John Pfuelb. The will was duly probated in the Jefferson county court and his children, appellees herein, appealed to the circuit court seeking to have the will set aside on the grounds that their father, the testator, was mentally incompetent to make a will. Upon a trial of the case before a jury in the circuit court the jury found that the writing purported to be the will of the testator not to be his last will and testament, and from a judgment entered upon the verdict, his widow, Wilhelmina Pfuelb, and the other two named beneficiaries have prosecuted this appeal.

The motion and grounds for a new trial consist of various items, viz., (a) that the court erred in failing to sustain appellants' motion for a directed verdict in their favor at the close of the evidence; (b) the court admitted incompetent evidence offered by appellants; (c) the court erred in instructions given the jury; and (d) the verdict is not sustained by sufficient evidence and is flagrantly against the weight of the evidence. In brief of appellant, ground (c) instructions is not insisted on, hence we will consider only the other items.

The only question presented for our determination on this appeal is the sufficiency of the evidence to estab-

lish mental incapacity of the testator, and the ruling of the court in the admission of the alleged incompetent evidence.

John Pfuelb, the oldest son of the testator, testified that before he finished the eighth grade in school his father hired him out to work and took all his wages except 5 cents on the dollar which he allowed him for spending money. He testified in detail concerning for w⌐om he worked and the wages he earned, etc., until he joined the army in 1917, during the World War, and that his father was very much opposed to his joining the army and told him that if he joined the army he would disown him and throw him out; that he came home just after enlisting in the army and said, "I was thrown out of the house and I was not allowed back in—I did not come back until 27 months later"; that during the time he stayed in the army his father wrote him only one letter in which he asked him to send him some money. Upon his return from the army he went home to see his parents and his mother received him but his father was down in the basement and would not come up and he went down there to see him. He was asked if his father knew he was coming home, and he said: "Oh! yes sir. He knew it. Before I got in the front door he went down in the basement purposely. Mother said so." It is insisted for appellants that the evidence of the witness relating to his father's objections to him joining the army was not only incompetent to establish insanity but testator being a native of Germany, having come to this country many years ago, that this array of evidence concerning his objections to his son joining the American Army, indicating a sympathy on the part of the testator with Germany during the World War, was highly prejudicial. Conceding that this evidence was insufficient to establish mental incapacity of the testator and that same might have been prejudicial, yet appellants are in no position to complain of this evidence, since there was no objection thereto, nor was there any objection to the witness' statement that his mother told him that when he appeared at the front door or when his father saw him coming, he purposely went into the basement.

The same witness testified that his father apparently had always disclosed a mental aversion to him; that he was always mean to him from his boyhood and frequently had him arrested as often as once or perhaps

twice a week, and had him taken before the police court, where upon investigation of the charge he was dismissed; that at times his father appeared normal and at other times, especially when he would have him arrested, his actions were very much abnormal. He said that for several years previous to his father's death he would talk about anything or subject, but whether it was right or wrong he took the opposite view—"anything to start a wrangle"—and seemed to enjoy misery and seeing others in misery; that he was a man of very violent temper and that his eyes were glassy "and you would think they were going to pop out and would be real raving when he would get in those stages * * * and that anybody looking at him could tell something was the matter—it was a scary look that he had and was a look that you could tell that no normal person would carry." It is further shown by the evidence that the testator hanged the family dog without assigning any reasons for his act, and he also killed a cat by throwing it in a furnace; in speaking of hanging the dog and throwing the cat in the furnace, testator said, "I threw the damn cat in the furnace and had to hang the dog," but he gave no reason for his acts.

The evidence of Mrs. Elizabeth P. Herbold, a married daughter of testator, is very similar to that of John Pfuelb. She testified that she quit school while she was in the seventh grade and took up dressmaking as a trade and gave practically all of her earnings to her father. She testified that her father was ill-tempered and abused her mother and would grab her by the chin and try to choke her until he made her chin bleed; that all he had on his mind was "killing" until he had the whole family so frightened they were afraid to go near him; that when he had those spells he was wild and looked like a man "just out of a cage"; that at times he would go into a stupor for about a week; that he was going down physically and always looked worse after he had those fits of temper. After detailing many other unusual acts of her father along the line we have indicated, none of which were objected to, she was asked a hypothetical question based upon her knowledge and observation of testator and the things she saw him do, and particularly when she visited him in April, 1936, a short while before he wrote his will, whether or not he had mind enough to know the nature and extent of his estate and the whereabouts of same, the object of his bounty

and his duty to them and to dispose of his property according to a fixed purpose of his own, and she answered, "No sir, he could not." Objections to the question and answer were overruled and appellants excepted. It is the rule that lay witnesses may express their opinion as to the mental capacity of a person once the witness has detailed facts sufficient to support the opinion. Nalty's Adm'r v. Franzman's Ex'r, 221 Ky. 709, 299 S. W. 585. In view of the facts detailed by the witness we think her answer to the hypothetical question was competent.

Mrs. Eleanor Horlander, another married daughter of testator, gave testimony similar to that of the preceding witnesses with relation to testator's conduct toward the family. She stated that on one occasion her child came to her crying and said that testator had a hatchet in his hand and got hold of the top of his head and was going to hit him with the hatchet. Objections were made to the witness' statement concerning what the child told the witness and the court reserved ruling on the question for the time being and permitted the witness to tell the whole story; the witness further stated that she went into the backyard and saw testator coming and he asked her what kind of a lie the child had told her. She asked him what he did to the child, and testator told her what he did and she asked him why he did it and he said the child was digging in the ground with the hatchet and he took the hatchet and was going to hit him with it. The court then overruled the objections. The jury having had the benefit of testator's own statement admitting that he did what the child told his mother he did, we do not think that the "hearsay" part of the evidence could have been prejudicial. It will not be presumed that the jury ignored the frank admission of testator that he did exactly what the child said he did, and was controlled solely by the statements of the child to his mother.

The testimony of Anna McGrath, another daughter of testator, was along the line of and cumulative to that of the preceding witnesses in respect of decedent's conduct toward his family, his strange and unusual acts, cruelty, etc. She further stated that a real estate agent came to see her and talk to her about a real estate transaction, and she told her father about the transaction she was contemplating and the agent with whom she was negotiating; testator told her that the agent was no good and a swindler and told her how the agent had swindled

his, agent's father-in-law out of money; on the same evening, in about half hour the agent came to her father's home and talked with her about the real estate deal and after he left testator asked her who those people were and she told him that that was the party he told her about that swindled his father-in-law out of that money, and testator asked her "what father-in-law and what man she was talking about," and apparently had forgotten his conversation with her and all he had told her thirty minutes previous. This witness, as well as others, testified to many incidents indicating that testator at times had complete lapse of memory and could not remember things that he said or did a short time previous.

Another married daughter, Mrs. Adelaide Russman, testified to many strange and unusual things testator did and said; that on several occasions he pulled a knife on her and tried to kill her and she had to leave the house; on one occasion he approached her with an ax and was going to kill her. On another occasion he became provoked at her younger sister and procured a crowbar and sat at the front door in his night clothes with the crowbar on his lap waiting for his daughter to return, and the family became so frightened that they sent for John Pfuelb to come to their home to protect the daughter, but testator went to sleep before the daughter came in and there was no trouble. She took the crowbar and hid it in the closet in her room, and later testator wanted it and she told him about what had happened and why she hid the crowbar, but he did not remember anything about the incident; that testator frequently drew knives on the family, at least once a day, and when he had those spells he would talk loudly and incoherently and get real violent and his eyes would get glassy and stary.

The most unusual incident was testified to by Mrs. Eva Dittmeir. She said that when testator's first wife died in 1932 she and her husband went to the house to see her. She related what occurred in the following language:

"A. My husband and I walked in. He was in the room—the next room. He walked in then to meet my husband and I. I went on to say that some friend of his, a woman named Blundy had said what a fine looking corpse she was. He said—this

594

Mrs. Blundy said what a fine looking corpse she was. He said well, what are you going to do? He took his hand and slapped her down in the face and the coffin just rocked, and my husband and I took hold of the coffin. He said what are you going to do? The woman is cold—he says, she is ice cold."

After this he told the witness that he had "throwed the damn cat into the furnace and he had to hang the dog."

Dr. C. G. Russman testified that he had known testator for nine or ten years, during which time he had an opportunity to see and observe what kind of man he was, and that he had an abnormal attitude toward his children. In answer to a hypothetical question, based upon the facts proved in the record relating to the acts and conduct of testator, Dr. Russman said that testator did not have mind enough to make a will. There is also evidence that testator frequently threatened to hang himself. The witness further testified that on one occasion he was called to the home of decedent and was told by the family that testator was going to kill them with an ax, but when he arrived at the home the policeman had taken him away. This evidence was objected to on the grounds that it was "hearsay." The court ruled: "The objections will have to be overruled if he knows of his own personal knowledge." The court should have unconditionally sustained the objections to the evidence of the witness as to what he was told, but what the members of the family told the witness was merely cumulative to an abundance of competent evidence tending to establish cruel and violent acts of decedent toward his family. The admission of incompetent evidence to prove a fact already established by competent evidence, is not regarded as being so prejudicial as to warrant a reversal. On the other hand, evidence adduced in behalf of appellants, propounders of the will, tended to contradict the evidence adduced for the contestants, appellees.

Dr. C. L. Nichols testified that during the month of May, 1936, he saw testator four times and that he diagnosed his condition as a disease of the heart muscles, his blood pressure was high and he would have heart attacks; that he was not suffering from any mental trouble or disease but in the latter part of May, 1936, he was in a coma. He said that testator was not mentally

incapacitated on or about May 5, 1936, when the will was written. However, on cross-examination, in response to questions, the doctor said that it was abnormal for a man to have an idea that his children were all against him, or to threaten his five-year-old grandson with a hatchet.

Dr. E. S. Fry, called as a witness for appellants, testified that he had known the testator for about forty years and that he saw him during the year 1936 from February 15th to June 21st, the day he died. He described testator's disease, etc., but said that his mind was perfect, although he was a little "eccentric." When asked about the unusual things testator had said and done and whether or not he thought a normal man would do those things, the doctor still insisted that he did not think testator was abnormal but those things resulted from his "eccentricities," and indicated that he doubted the testator had said or done those things, but admitted that if they were true he was not normal at the time, but would "lose his reason and that he may have been drinking." He was asked to give his medical opinion as to what character of man it would be who would strike his wife's corpse as related by the witness, and the doctor said "it would be a different man from what I have just pictured him, the way I knew him. Q. He would be a very abnormal man, wouldn't he? A. He would be perhaps abnormal under those conditions," but the witness still insisted that testator had merely lost his reasoning power.

It is insisted that the evidence, though taken as true, tends to show nothing more than that testator was ill-tempered and inclined to be rather cruel, and is insufficient to establish insanity or mental incapacity. Cruelty and insanity are not always co-existent. It is commonly known that some cruel people are not insane and that some insane people are not cruel. And it is equally well known that some insane people are cruel. As to whether or not cruelty is evidence of insanity depends upon the nature of the cruelty, the existence or non-existence of a cause or reason for cruel acts and the circumstances generally.

We do not think the fact that testator was high-tempered and merely intolerant with his family, neglected the education of his children, and hired them out to work and took practically all of their wages and dis-

liked animals, was evidence of insanity. But it must be admitted that testator's cruel destruction of the family cat and dog in the manner described and admitted by him, without any reason or explanation therefor, together with many unusual, violent and dangerous assaults upon the members of his family and threats to take their lives and threats to take his own life by hanging himself, are indeed unusual and is evidence of an abnormal mind. The assault by testator upon the corpse of his wife, together with the statements he made in connection therewith, is so strange and unusual that it cannot be accounted for except upon the grounds of insanity. There is no escape from the conclusion that he was insane at that time. But appellants insist that this incident and many others testified to by the witnesses occurred in 1932, four years before the will was written, and if it be conceded that testator was abnormal at that time it is not evidence that he was abnormal or insane at the time the will was written, and, to establish mental incapacity of the testator it was incumbent upon the appellees to prove that he was incapacitated at or about the time the will was written. It is the rule that proof of insanity at a remote period before the writing of a will is not competent to establish insanity at the time of the writing of the will, unless it is shown that such insanity or mental incapacity continued from the remote date down to the time or approximately the time of the writing of the will. Moore v. Com., 92 Ky. 630, 18 S. W. 833; Jefferson Standard Life Insurance Company v. Cheek's Adm'r, 258 Ky. 621, 80 S. W. (2d) 518. The evidence of a number of witnesses including one of the doctors, who testified for appellees, tends to show that testator's mental condition as it existed in 1932 and prior thereto and during the lifetime of his first wife, was continuous and existed up until the time of his death.

Conceding, without deciding, that the verdict of the jury is against the preponderance of the evidence, yet it must not be forgotten that, in reviewing a finding of fact by a jury the court is not concerned with the preponderance of the evidence, but with the sole question of whether or not there is sufficient substantive and probative evidence to support the verdict. Considering all the evidence, it seems to us that it presents a series of facts so inconsistent with the conduct of a normal man as to indicate derangement of mind, and we cannot say that its probative effect was sufficiently overcome by the

evidence of appellants and to justify the conclusion that the verdict is flagrantly against the evidence.

Judgment affirmed.